UNITED STATES v. ALASKA PACIFIC FISHERIES et al.

(First Division. Juneau. June 29, 1916.)

Nos. 263–KA, 1468–A.

1. PUBLIC LANDS ⊜⟶47—RESERVATION OF WATERS.

By Act Cong. March 3, 1891, c. 561, § 15, 26 Stat. 1101 (U. S. Comp. St. 1916, § 5096a), Congress set apart the body of lands known as Annette Islands, in Alaska, as a reservation for the use of the Metlakahtla and other Indians. On the 28th day of April, 1916, the President of the United States issued his proclamation reserving the waters within 3,000 feet around the shore of said island for the same public use. Prior to the President's proclamation of April 28, 1916, the defendant had begun, and at its date had almost completed, a fish trap situate in navigable waters and within 2,000 feet of the shore of Annette Island. The United States brought this suit to enjoin the defendant from operating his said fish trap in said reserved waters and to compel its removal therefrom. *Held*, the President of the United States has power to reserve both land and waters belonging to the public domain for public purposes, and the reservation of the waters in question is sustained. Defendants are trespassers and may be removed from the locality.

2. UNITED STATES ⊜⟶126—INJUNCTION—EQUITY.

The United States brought a suit to enjoin the defendant from occupying the area of waters around Annette Island, Alaska, with fish traps, or from fishing therein. Defendants deny the United States has any equity for an injunction, because it has no pecuniary interest in the cause of action. *Held*, the obligation and duty of the United States to protect the property interests and rights of its wards, the Indians on its reservations, is enough to give it a standing in equity, and a sufficient interest to authorize it to maintain jurisdiction. Injunction granted.

On March 3, 1891, Congress passed an act entitled "An act to repeal the timber culture laws," the fifteenth section of which act reserves "that body of lands known as Annette

⊜⟶See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Islands" for the use of Metlakahtla Indians and others therein named.

In April of 1916 the defendants, without permission of any kind, began, and at the date of the proclamation hereinafter mentioned had almost completed, a fish trap situate in navigable waters within 2,000 feet of the shore of Annette Island. Defendants design to complete said trap and to have it ready for effective operation by the time of the commencement of the run of fish, to wit, about July 1st. On the 28th day of April, 1916, the President issued a proclamation reserving—

"the waters within three thousand feet from the shore * * * at mean low tide of Annette Island, Ham Island, * * * Lewis Island, Spire Island, Hemlock Island, and adjacent rocks and islets; * * * also the bays of the said islands, rocks, and islets, are hereby reserved for the benefit of ·the Metlakahtlans and such other Alaskan natives as have joined them or may join them in residence on these islands." 39 Stat. 1777.

The government by this suit seeks an injunction to prevent the defendants from operating said trap and to compel the removal of said trap, basing its suit on the claim that the continuance of the trap at the locus quo is in defiance and violation of the terms of the act and the proclamation, and is also in violation of section 10 of the Rivers and Harbors Act approved March 3, 1899. 30 Stat. 1151, c. 425 (U. S. Comp. St. 1916, § 9910).

Defendants contend that the act itself does not reserve any water, and that the proclamation is unauthorized so far as it attempts to reserve any part of the waters, and so is null and void, and that the trap is not an obstruction to navigation, and so does not come under the inhibition of the Rivers and Harbors Act aforesaid.

James A. Smiser, U. S. Dist. Atty., of Juneau.

James M. Shoup, of Ketchikan, C. H. Hanford, of Seattle, Wash., and Hellenthal & Hellenthal, of Juneau, for defendants.

JENNINGS, District Judge. Considering the act and proclamation, the following is to be observed: The Attorney General, having been asked for an opinion as to whether or not the President could lawfully set apart a

body of. public domain for the use of alien born Indians, on February 28, 1887, gave it as his opinion that the power of the President "to declare permanent reservations for Indians to the exclusion of others on the public domain does not extend to Indians not born or resident in the United States," and that it would require an act of Congress to make the reservation aforesaid.

Notwithstanding no act in the premises was in force (but probably in contemplation of the passage of such an act), a tribe or body of Indians known as Metlakahtlans did emigrate from British Columbia and settle upon Annette Islands. There they built and occupied houses, constructed and furnished in the way of the white man, erected churches and schools, planted small gardens, established a rude form of local self-government, and generally attained a state of civilization far superior to that of most natives and of some white men. The principles of humanity naturally dictated that these people should be encouraged in the exercise and development of the intelligence, thrift, and industry of which they had given abundant evidence; and, too, manifestly it was highly desirable that native Alaska Indians should, if possible, be induced to join them. So, on March 3, 1891, Congress inserted the following provision in the act approved March 3, 1891, entitled "An act to repeal the timber culture laws" (26 Stat. 1101), to wit:

"Sec. 15. That until otherwise provided by law the body of lands known as Annette Islands, situated in Alexander Archipelago in Southeastern Alaska, on the north side of Dixon's entrance, be, and the same is hereby, set apart as a reservation for the use of the Metlakahtla Indians, and those people known as Metlakahtlans who have recently emigrated from British Columbia to Alaska, and such other Alaskan natives as may join them, to be held and used by them in common, under such rules and regulations, and subject to such restrictions, as may [be] prescribed from time to time by the Secretary of the Interior."

In passing this act, Congress must be held to have known (what every one else knew) that the Indians of Alaska are fisher folk and hunters and trappers, and largely, if not entirely, dependent for their livelihood upon the yield of such vocations. It must be held to have known that without the food yield of the sea these Indians could not survive, for the Annette Islands would not of themselves, "as land," afford a

subsistence for a community of souls; there being little or no agricultural land on the islands, or for that matter in all Southeastern Alaska.   Not only is the act an encouragement to remain, extended to those Metlakahtlans "who had recently emigrated," but it is also an invitation to come, held out to all Metlakahtlans and to such Alaska natives as may join them.   The act affords no promise that the privilege conferred is to be exercised in whatsoever manner the Indians may choose; on the contrary, the use granted is to be held and exercised "under such rules and regulations as may be prescribed from time to time by the Secretary of the Interior."   In other words, the "Great White Father" says to the Metlakahtlans and to "all other Alaskan natives who may join them":

"You are welcome to come to these islands, to make your homes here, to make a livelihood here, to pursue such occupations as you may see fit.  My Secretary will make some regulations and restrictions for your welfare, your happiness, and your protection.  You may use these islands subject only to such rules and regulations, and under such restrictions as he may make."

Good faith undoubtedly requires that the rules and regulations or restrictions spoken of shall not be taken as rules and regulations or restrictions binding only the Indians, but as rules, regulations, and restrictions binding upon all other persons.   Such requirement is necessary in order that the thing to be done may be effected according to the true intent, meaning, and purpose of the donors, and in justice to the donee.   The object to be accomplished is that these Indians may work out their destiny—that they may develop into good citizens, useful and happy—not alone for their own sake, but for the good of the country and in the interest of humanity and civilization.   A reservation is created for them—not the ordinary Indian reservation, within whose limits they are to be confined, but a reservation which shall be their home, if they choose to make it their home—where the race may multiply and increase, and develop under the guiding hand of a high officer of the government.

It has been suggested that, when the government grants the upland, the high-water mark is the boundary of the grant, and that in strictness these Indians are entitled to the exclusive use of only so much as is above high-water mark; but

the privilege conferred bears no analogy to a grant of land. Nothing is granted to these Indians except a privilege, and that, too, only "until otherwise provided by law." No title is parted with by the government. To hold that the privilege extended means nothing more than that the Indians are to have the use of the upland only is to say that Congress is engaged in the business of luring the unsuspecting, of cheating and deceiving them. The language is not to be construed in the strict, narrow, legal sense which obtains between equals dealing at arm's length, but in a broad and generous sense, in which words are to be taken when one of superior power, knowledge, and intelligence deals with an inferior. The language used must not be so interpreted "as to justify the charge that the government has laid a trap" for these people.

To construe the invitation extended by the act with all the strictness of a legal conveyance of real estate would defeat the very object contemplated by the act.

Good faith also suggests that, when Congress set apart "that body of lands known as the Annette Islands," it ought not to be held to mean only land. It must be held to mean "the lands" generally and the adjacent sea to a reasonable extent in which alone were to be found that which made living upon the land a possibility—a practicability. The very generalty of the terms used, to wit, "the body of lands," "Annette Islands," would seem to indicate that Congress did not mean to dole out its generosity in inches, feet, or even acres, but that it meant to confer a useful, practicable, benefit to the Indians, by securing to them a useful and practicable home.

The "body of lands known as Annette Islands" should be taken to mean "that region" known as Annette Islands, as if one should say that body of lands known as Alaska, or that body of lands known as the Philippine Islands, or Porto Rico.

Congress meant to make an Indian reservation. Alaska, it is true, is not Indian country in the conventional sense of the word, and the aborigines of Alaska have never been compulsorily herded upon reservations, yet it is Indian country so far as Congress chooses to make it such (U. S. v. Nelson [D. C.] 29 Fed. 202), and "that body of lands known as Annette Islands" is an Indian reservation, because Congress has chosen to make it such. From that day, to the encroach-

ment by the defendant complained of by the complaint, the Indians and the public generally have treated the act as one reserving the waters immediately contiguous to the high land of these islands as well as the high land itself.

It is in evidence that from the date of the act until the irruption of these defendants in 1916, a period of 25 years, no attempt has been made to encroach upon the use by the Indians of the islands or the waters adjacent thereto. (Verney's affidavit.) On the land they have built their houses, while the waters surrounding the islands have furnished them with a bountiful supply of fish. At first the only use for the fish caught was for immediate consumption, or for smoking for use later by the tribe and those with whom they bartered; but, with the development of the fish-canning industry in Alaska, a wider and more lucrative market for fish sprang into existence. The Indians, under the directions of him who had brought them out of barbarism, established and for some time operated a salmon cannery. This not only supplied them with a very edible variety of food, but also furnished employment to many of the tribe and other Indians.

Congress had the right to do as it pleased with these lands and waters. The people of the United States, succeeding to and exercising the prerogative of the British crown and the powers of Parliament, certainly have plenary power, through their representatives, over the lands and waters of the United States—to make reservations of land for public purposes, to grant exclusive rights of fishery, and even to close navigable waters. 2 Farnham on Waters, § 370, p. 1373.

The Congress, representing the people of the United States, has under the Constitution the power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States. Const. art. 4, § 3.

Annette Island, and all islands, lands, and waters in Alaska, were, on March 3, 1891, the property of the United States. Congress made this reservation for these Indians, and has confirmed it in later legislation (Tenth proviso of Act May 14, 1898, c. 299, 30 Stat. 409 [U. S. Comp. St. 1916, § 5091]; Compiled Laws of Alaska 1913, § 92), and has strikingly manifested its approval of the Metlakahtlans by Act March 4,

1907 (34 Stat. 1411, c. 2929; Alaska Compiled Laws 1913, §
24), allowing them to own motorboats and take out licenses
as engineers and pilots and masters.

Some time in April of 1916 defendants went upon the wa-
ters within about 2,000 feet of the low-water mark of An-
nette Island and began the construction of a fish trap, such
as is commonly used by the cannery men of Alaska whereby
to secure a supply of salmon for canning.  Such fish traps are
very effective for the purposes for which they are intended,
and unless such contrivances are thoroughly regulated and
supervised they will eventually completely exhaust the sup-
ply of fish.  It appears from the evidence that the islands
are very advantageously situated in this regard.  They are
comparatively near the open sea, and large quantities of sal-
mon, coming therefrom and making their way to their spawn-
ing grounds, pass within the 3,000-foot limit fixed by the
President's proclamation herein mentioned.  It also appears
that fish trap sites are not only becoming very scarce farther
in shore, but also the nearer the open sea the fish are caught
the better they are for canning purposes.  (Burckhardt's tes-
timony.)

The run of fish at Annette Island does not commence until
about July 1st of each year, and before the webbing or net-
ting was put upon the trap in question the President issued
the said proclamation.  That proclamation in terms is more
specific than the terms of the act.  The act does not say any-
thing in specific terms about "3,000 feet" of the shore of An-
nette Island, but the proclamation does.

The power of the President to withdraw land or water
which the United States owns and over which it has exclusive
jurisdiction and devote it to use for the public good can
hardly be successfully denied.  Such power has been exercised
from the earliest times in the creation of Indian reserves, and
military and naval reserves, and as sites for fortifications,
etc.  Indian reservations are reservations for the public pur-
poses.  17 Op. Atty. Gen. 260.

"An Indian reservation is part of the public domain set apart by
the proper authority for the use and occupation of a tribe or tribes
of Indians. It may be set apart by an act of Congress, by treaty, or
by executive order." Wolcott v. Des Moines, 5 Wall. 681, 18 L. Ed.
689; Grisar v. McDowell, 6 Wall. 663, 18 L. Ed. 863; U. S. v. Payne
(D. C.) 8 Fed. 888; 43 Cases of Brandy (C. C.) 14 Fed. 539.

It is not unreasonable to construe the act itself as a reservation not alone of the land, but also of a reasonable extent of waters immediately adjacent thereto, which may be necessary to effect the objects and purposes of the act interpreted in the light of circumstances and conditions.  For the executive so to construe it, and to make rules and regulations and restrictions in accordance with such construction, is not to usurp legislative functions.  It is but to execute the law in its true scope and meaning.

By the Constitution (article 2, § 3) it is made the President's duty to "take care that the laws be faithfully executed."  Mr. Justice Miller has asked:

"Is this duty limited to the enforcement of the acts of Congress according to their express terms, or does it include * * * all the protection implied by the nature of the government under the Constitution?"  In re Neagle, 135 U. S. 64, 10 Sup. Ct. 658, 34 L. Ed. 55.

Presidential reservation of a portion of the sea, under an act reserving in terms only "lands," finds precedent in the action of President Harrison, who by his proclamation of December 24, 1892, set apart "Afognak Island, Alaska, as a public reservation, including use for fish culture station, and its adjacent bays and rocks and territorial waters, including among others the Sea Lion Rocks and Sea Otter Island," and said proclamation contained an express warning to all persons "not to enter upon or occupy the tract or tracts of land or waters reserved by this proclamation, or to fish in or use any of the waters herein described or mentioned, and that all persons or corporations now occupying said island, or any of said premises, except under said treaty shall depart therefrom."  27 Stat. 1052; Compiled Laws of Alaska 1913, p. 174.

It will be seen that this is a very extensive reservation of waters and a very drastic curtailment of the rights of both fishery and navigation, and yet the only act of Congress on the subject which I have been able to find is contained in the fourteenth section of said act of March 3, 1891, as follows:

"That none of the provisions of the last two preceding sections * * * shall be so construed as to warrant the sale of any lands [note the word "lands"—R. W. J.] * * * which shall be selected by the United States Commissioner of Fish and Fisheries on the is-

land [note the words "on the island"] of Kodiak and Afognak for the purpose of establishing fish culture stations." U. S. Comp. St. 1916, § 5082.

This reservation has never been directly attacked, but in the case of Russian American Co. v. U. S., 199 U. S. 579, 26 Sup. Ct. page 159 (50 L. Ed. 314), the Supreme Court say:

"As the President exercised the rights thus reserved, and declared the whole island appropriated for the purpose of establishing a fish culture station, and warned all persons to depart therefrom, it is clear that the rights, if any, previously acquired by the settlement, were terminated by the proclamation."

I am forced to the opinion that the area marked on the plat accompanying the proclamation of the President in evidence in the case at bar is lawfully reserved, that it is a reasonable reservation—a necessary one, for public purposes— "of territory or other property belonging to the United States," and that defendants are trespassers.

But it is said that, even granting that the intent, meaning, and scope of the reservation in the act is broad enough to include the area within 3,000 feet of the low-water mark, or granting the validity of the President's proclamation, still the United States has no equity for an injunction, because it has no pecuniary interest.

This suit is brought by the government in its capacity as sovereign, as well as in its capacity as lord paramount of the land and the water. The sacred faith of the nation is pledged to these Indians. The latter are invitees of the government. The obligation on the part of the government to live up to its obligations is enough to give it standing in equity, even if there were no other considerations.

In U. S. v. World's Columbian Exposition (C. C.) 56 Fed. 630, where the standing of the government in a suit for injunction was challenged on the ground of lack of pecuniary interest, the court, after deciding that the government did in fact have a pecuniary interest, observes (page 638, bottom):

"And, besides, it is under the highest obligations of honor and law to protect the property and interest of foreign nations and of the several states of the Union, and of all exhibitions brought" here by "its invitation. * * * Having such * * * and having no other means of enforcing obedience to its regulations, the government is entitled to the assistance of the court. * * * There are other

rights and interests quite as sacred as dollars, and equity protects against injuries which cannot be measured in money. * * * "

And on page 640:

"The right of the government to maintain a bill in equity on the ground of obligation or duty either to an individual or to the public, when it had no pecuniary interest, has been affirmed in several instances by the Supreme Court." U. S. v. S. J. Tin Co., 125 U. S. 273, 8 Sup. Ct. 850, 31 L. Ed. 747; U. S. v. Beebe, 127 U. S. 338, 8 Sup. Ct. 1083, 32 L. Ed. 121; U. S. v. Marshall, 129 U. S. 579, 9 Sup. Ct. 343, 32 L. Ed. 734; Curtner v. U. S., 149 U. S. 662, 13 Sup. Ct. 985, 1041, 37 L. Ed. 890.

The foregoing considerations dispose of the case at bar and call for the issuance of an injunction as prayed for by the government.

Plaintiff also bases the right to an injunction on the allegations in the complaint, and the proof offered in support thereof, that the defendants' structures are a hindrance to navigation and are in violation of the provisions of the Rivers and Harbors Act of 1899; so far as this contention is concerned, I am constrained to hold with the defendants. I do not think that the structures are a hindrance to navigation.

Findings and decree may be prepared in accordance herewith.