**UNITED STATES of America, Plaintiff,**

v.

**Martin Reggie BOOTH, Defendant.**

**No. 1731–KB.**

District Court Alaska,
First Division, Ketchikan.

April 25, 1958.

---

4. f.n. **1**, supra.

C. Donald O'Connor, Asst. U. S. Atty., Ketchikan, Alaska, for plaintiff.

Charles W. Hughes, Ketchikan, Alaska, for defendant.

KELLY, District Judge.

This case was set for trial by jury on a two count Information, filed in this court on October 22, 1957. Count One, charging assault and battery, was dismissed on motion of the Government at the suggestion of the complaining witness, Frank Bolton. The defendant appeared in court with his attorney and pleaded guilty on April 21, 1958, to Count Two of the Information charging driving while under the influence of intoxicating liquor.

In view of an earlier motion directed to the jurisdiction of the court and in view of the recent decision of the District Court of the Third Division, District of Alaska, Petition of McCord, 151 F.Supp. 132, the Government, as well as the Court, felt it was necessary to go fully into the question of the Court's ju-risdiction in this case, as well as in violations of territorial law committed in the community of Metlakatla, Alaska. Accordingly, the Assistant United States Attorney, C. Donald O'Connor, on behalf of the Government, prepared and filed a most exhaustive brief on the points involved herein and because of the excellence of this brief, the Court adopts the same, with a few additions and appropriate rewording, as his opinion.

Metlakatla is a community made up of Indians who emigrated prior to March 3, 1891, for purposes of religious and economic freedom, from British Columbia to Alaska, their descendants, and Alaska natives who have subsequently joined them. The United States Government set aside the Annette Islands in the Alexander Archipelago in Southeastern Alaska for their use by 48 U.S. C.A. § 358 (March 3, 1891, Chap. 561, Sec. 15, 26 Stat. 1101).

The present community includes descendants of the original settlers, Indians who have been admitted as members of the community after leaving communities of Haida Indians in Alaska, and communities of Thlingit Indians in Alaska, and also native Eskimos and Aleuts who have been admitted as members of the community. Testimony adduced at a hearing in connection with the jurisdiction of the court disclosed that at least one Eskimo member of the community has served on the Metlakatla City Council. The present Mayor of Metlakatla was originally a Thlingit Indian from Sitka, Alaska.

There is no tribal organization in Metlakatla and in fact, the original settlers expressly renounced their tribal affiliations prior to coming to the Annette Islands. The chief executive officer of Metlakatla is the Mayor. The community also has a Council and Magistrate. The community is independent and well developed from a commercial standpoint. In the past it has always been assumed that territorial law applied to Metlakatla. Testimony of two witnesses was introduced by the Government. Mr. Henry

F. Littlefield, Sr., Mayor of Metlakatla, and Mr. A. H. Ziegler, attorney for the city, were both sworn and testified to the facts concerning the migration of the original group of Indians from British Columbia to Annette Island, and to the other facts which are more fully set out hereinafter.

The evidence produced by the Government showed, first, that the Indians of Southeastern Alaska live under entirely different conditions from the Indians on the Tyonek Reservation and therefore the provisions concerning Indian country have no application to them, and

Second, that Metlakatla, by its history, is not a traditional Indian Reservation for the reasons:

1. That it has no tribal organization;

2. It is not made up of aboriginal Indians but largely of the descendants of immigrants who came from Canada during the 19th century; and

3. That Metlakatla is not an Indian Reservation but rather a reservation for Indians who came from British Columbia, their descendants, and Alaska *natives* who choose to join them. In effect, the word *natives* includes Eskimos and Aleuts, and in actual fact there are Aleut and Eskimo members of the community who are not of the Indian race.

The Government then points out the following points in its argument:

1. *That the Indians of Southeastern Alaska live under entirely different conditions from the Indians on the Tyonek Reservation and the provisions concerning Indian Country have no application to them.*

The decision in the McCord case was narrowly restricted in its application to the facts of that case. At page 136, Judge McCarrey stated:

"This decision should not be interpreted by members of the native groups, be they Indian or Eskimo, as a general removal of the territorial penal authority over them, for the reason that this court will take judicial notice that there are few tribal organizations in Alaska

that are functioning strictly within Indian country as defined in 18 U.S. C. § 1151 et seq. As I have said, only when the offense fits distinctly within the provisions of the applicable federal law will territorial jurisdiction be ousted. Testimony indicates that the Tyonek area, unlike most areas inhabited by Alaska natives, has been set aside for the use of and is governed by an operational tribal unit. Under these conditions, I can see no alternative but to order the release of the petitioners."

There is no area in Southeastern Alaska that is expressly "set aside for the use of and is governed by an operational tribal unit" and certainly Metlakatla does not come within this limitation. That there are numerous groups of Indians in Alaska who have no tribal-type affiliation is borne out by the terms of the Wheeler-Howard Act which, when it was extended to Alaska by 25 U.S.C.A. § 473a, provided:

"473a. Same; application to Alaska

"Sections 461, 465, 467, 468, 475, 477 and 479 of this title shall after May 1, 1936, apply to the Territory of Alaska; *Provided,* That groups of Indians in Alaska not recognized prior to May 1, 1936, as bands or tribes, but having a common bond of occupation, or association, or residence within a well-defined neighborhood, community, or rural district, may organize to adopt constitutions and bylaws and to receive charters of incorporation and Federal loans under sections 470, 476, and 477 of this title. May 1, 1936, ch. 254, § 1, 49 Stat. 1250."

Compare this with Section 476, applying to American Indians in general, which reads as follows:

"Any Indian tribe, or tribes, residing on the same reservation, shall have the right to organize for its common welfare, and may adopt an appropriate constitution and bylaws * * * "

It is readily seen that the Wheeler-Howard benefits can safely be limited to tribes in the United States without running the risk of taking benefits from large groups of unorganized Indians.

In Southeastern Alaska there are many groups of non-tribal Indians and therefore special language was necessary to bring the Indians of Southeastern Alaska within the terms of the Wheeler-Howard Act.

That the Indians of Southeastern Alaska are to be treated differently from the Indians of the Tyonek reserve and perhaps other Indians in the Interior of Alaska as well as in the United States is apparent from the decision of Judge Folta in the case of United States v. Libby, McNeil & Libby, D.C. 1952, 107 F.Supp. 697, at page 699:

" * * * in the ensuing 54 years the Indians of Southeastern Alaska, and particularly the Haidas, have not only abandoned their primitive ways and adopted the ways of civilized life but are now fully capable of competing with the whites in every field of endeavor * * * It is a matter of common knowledge that today the Indians of Southeastern Alaska prefer the white man's life despite all its evils and shortcomings * * *

"Whatever may be said in justification of reservations in the unsettled regions of Alaska, they are viewed as indefensible in Southeastern Alaska, and generally condemned by whites and Indians alike as racial segregation and discrimination in the worst form * * * "

It would seem that in view of the development of the Indians in Southeastern Alaska and their participation in every phase of the life and economy of the white man that every presumption should be indulged in to avoid the effects of racial segregation and discrimination and to recognize the non-existence of Indian Country in Southeastern Alaska.

As early as 1886 the District Court in Alaska, Judge Dawson, said (In re Sah Quah, 31 F. 327, 328) specifically referring to the Indians at Juneau:

"Many of them have connected themselves with the mission churches, manifest a great interest in the education of their youth, and have adopted civilized habits of life. Their condition has been gradually changing until the attributes of their original sovereignty have been lost, and they are becoming more and more dependent upon and subject to the laws of the United States, and yet they are not citizens within the full meaning of that term.

"From the organization of the government to the present time, the various Indian tribes of the United States have been treated as free and independent within their respective territories, governed by their tribal laws and customs, in all matters pertaining to their internal affairs, such as contracts and the manner of their enforcement, marriage, descents, and the punishment for crimes committed against each other. They have been excused from all allegiance to the municipal laws of the whites as precedents or otherwise in relation to tribal affairs * * *

" * * * but does the rule * * apply to the Indians of Alaska? I think not, and for various reasons. The United States has at no time recognized any tribal independence or relations among these Indians, has never treated with them in any capacity, but from every act of congress in relation to the people of this territory it is clearly inferable that they have been and now are regarded as dependent subjects, amenable to the penal laws of the United States, and subject to the jurisdiction of its courts. Upon a careful examination of the habits of these natives, of their modes of living, and their traditions, I am inclined to the opinion that their system is essentially patriarchal, and not trib-

al, as we understand that term in its application to other Indians * * "

The authority of this case was recognized by Judge McCarrey in the McCord case, supra. He felt that the peculiar tribal circumstances of the Tyonek group warranted an exception from the general holding of the Sah Quah case.

Later, when a territorial government was formed, the reasoning of the Sah Quah case suggested that all of the Indian inhabitants came within the jurisdiction of the territorial laws. An excellent discussion of the history of the Indian Country provisions is found in Iron Crow v. Oglala Sioux Tribe of Pine Ridge Reservation, 8 Cir., 231 F.2d 89. That case demonstrates that it was the policy of the United States Government to allow Indian tribal organizations to maintain their traditional forms of self-government, and to recognize the tribes as dependent sovereignties. Southeastern Alaska has never known tribal organization since the purchase of Alaska from Russia.

Further evidence that Alaska Indians —even those in remote communities— are subject to Alaska territorial law, is 48 U.S.C.A. § 172, providing that teachers in the Alaska School Service designated by the Secretary of the Interior may be appointed by the Attorney General as special peace officers with authority to:

"* * * arrest, upon warrant duly issued, any native of Alaska charged with violation of any of the provisions of the Criminal Code of Alaska (Act March 3, 1899, Chap. 429, Thirtieth Stats. at Large, Pages 1253–56), or any amendment thereof, or any white man charged with the violation of any of said provisions to the detriment of any native of Alaska * * * and any person so arrested shall be taken * * * before a United States Commissioner or other judicial officer for trial * * * March 3, 1909, ch. 266, 35 Stat. 837."

It is to be noted that the only schools under the jurisdiction of the Secretary of the Interior are provided for in Section 169, schools "for and among the Eskimos and Indians of Alaska * * * " Therefore, it is obvious that congress considered the criminal code of Alaska to be applicable to Indians not living in white communities.

*2. Metlakatla is not an Indian reservation in the traditional sense and accordingly is not Indian country.*

18 U.S.C. § 1151 defines Indian country as:

"(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, * * * (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished * * * "

Subsection (b) does not apply to Metlakatla because Metlakatla is not dependent as a community and any benefits available to the residents as Indians are the same as those available to any Indian in Alaska, including Indians living in apartment houses in Ketchikan. Furthermore, it is doubtful that Metlakatla could be considered "within the borders of the United States." Congress could have used language such as "within any state or Territory," or "within the United States, its Territories and Possessions."

Subsection (c) pertains to allotments, which is a word of art, applying to the General Allotment Act, 24 Stat. 388, 25 U.S.C.A. § 331 et seq. and other statutes which refer to land patented to individual Indians. It has been held in numerous cases that such a tract within an organized reservation is Indian country. Therefore, only if Metlakatla is "land within the limits of any Indian reserva-

tion under the jurisdiction of the United States government" is Metlakatla Indian country.

It has been held that all reservations are not necessarily Indian country, United States v. Celestine, 215 U.S. 278, 279, 285, 30 S.Ct. 93, 95, 54 L.Ed. 195:

"* * * But the word 'reservation' has a different meaning, for while the body of land described in the section quoted as 'Indian country' was a reservation, yet a reservation is not necessarily 'Indian country.' The word is used in the land law to describe any body of land, large or small, which Congress has preserved from sale for any purpose. It may be a military reservation, or an Indian reservation, or, indeed, one for any purpose for which Congress has authority to provide, and, when Congress has once established a reservation all tracts included within it remain a part of the reservation until separated therefrom by Congress * * *"

It is to be noted that in the McCord case, supra, Judge McCarrey expressly pointed out that the Tyonek group was a tribe presided over by a Chief. He said, 151 F.Supp. at page 133:

"There is no dispute as to the fact that the petitioners and victims are full-blooded Indians and that they and their ancestors, for a long period of time, have resided in this area * * *"

On the same page there are numerous references to the tribe and the Chief of the tribe. Judge McCarrey also notes on the same page:

"All of the inhabitants in that area, except a white school teacher who resides there a portion of the year, and a Hawaiian who is married to a member of the tribe, are all native Indians and members of the tribe."

Metlakatla, on the other hand, is more an "Immigrant and Alaska Native Reservation" than an Indian reservation. Judge McCarrey cites the reasons for the

Indian country provisions as follows: (at page 134)

1. "* * * their (tribe) independent status, established by treaty, evidences a congressional intent to relieve them of the rule of the Territory, and, second, that the tribes must be protected from the restraints of a society they do not understand and into which they have not yet become assimilated. * * the federal court system may afford the Indian protection from a frequently unfriendly and occasionally hostile community until the time arrives when he is more adequate to defend himself. * * * the reluctance of the state authorities to assume the government of a large and tax-free population within its borders."

None of these reasons have any application to Metlakatla. Testimony shows that the original Metlakatlans could not come to Alaska with Father Duncan until they had formally renounced their tribal allegiance. The present membership of the community includes a racial and national mixture of British Columbians, Alaska Haida Indians, Alaska Thlingit Indians, and non-Indian Aleuts and Eskimos. The only government consists of a Mayor and village council. There has never been a Chief or medicine man at Metlakatla. The bylaws of the community do not call for allegiance to any tribe, although they do call for the members:

"1. To be faithful and loyal to the Government of the United States of America.

"2. To be loyal to the local government of our Community, to obey its ordinances and regulations, and to obey all applicable laws of the Territory of Alaska and of the United States.

"3. To cooperate earnestly in all endeavors for the education of our children, for the advancement of the Community and for the suppression of all forms of vice."

The original settlers of Metlakatla came to the Annette Islands, not because they were removed there after losing a war but because they sought religious and economic freedom in the United States as an alternative to oppressive conditions in British Columbia. The people of Metlakatla need no protection from the restraints of our society and they do understand our law.

The evidence has shown the various stages of their economic development and as Judge Folta noted in the case of United States v. Libby, McNeil & Libby, supra: there is little, if any, unfriendly or hostile community attitude toward the Indians.

The residents of Metlakatla pay Territorial income taxes, school taxes, gasoline taxes and generally all forms of state taxes paid by other residents of Alaska. There has been no reluctance demonstrated by Alaskan authorities to govern the Indians of Southeastern Alaska.

Judge McCarrey cites the case of United States v. Chavez, 1933, 290 U.S. 357, 54 S.Ct. 217, 78 L.Ed. 360, defining "Indian country" as:

> "Any unceded lands owned or occupied by an Indian nation or tribe of Indians * * *"

While this may be broad enough to cover the Tyonek area, it has no application to Metlakatla.

Furthermore, Section 1151 talks in terms of *"Indian* country" and *"Indian* reservations." Wherever Congress has intended the word "Indian" to include Aleuts and Eskimos, an express statement to that effect has been made, such as in 25 U.S.C.A. § 479, wherein it is stated:

> "For the purposes of said sections (Wheeler-Howard Act), Eskimos and other aboriginal peoples of Alaska shall be considered Indians."

See also 48 U.S.C.A. § 358a.

Metlakatla could conceivably become a community predominantly Eskimo or Aleut. There is nothing in the Indian country statute that expresses an intent to govern Eskimos or Aleuts or groups containing Eskimos or Aleuts, or, for that matter, Alaska natives generally, or immigrant Indian communities.

Evidence of congressional intent not to consider Metlakatla as a reservation can be found in 48 U.S.C.A. § 358a, where it is stated:

> "The Secretary of the Interior is authorized to designate as Indian reservation any area of land which has been reserved for the use and occupancy of Indians or Eskimos by Section 356 of this title * * *"

The only geographical area covered by Section 356 is Metlakatla and the Secretary of the Interior has never made such a designation.

Metlakatla is a reservation only in the most general meaning of the word. District Judge Jennings, in United States v. Alaska Pacific Fisheries, D.C.Juneau, 1916, 5 Alaska 484, on page 487, said of Metlakatla:

> " * * * a reservation is created for them—not an ordinary Indian reservation, within whose limits they are to be confined, but a reservation which shall be their home, if they choose to make it their home— where the race may multiply and increase, and develop under the guiding hand of a high officer of government."

The entire population of Metlakatla could move to Ketchikan—even against the will of the Alaska Native Service, and the Department of the Interior. If they choose to remain in Metlakatla and utilize the land set aside for them, it is a matter solely within their choice.

How, then, can they be considered dependent people on a par with traditional reservation Indians and in need of special protection from state law?

It is therefore the opinion of this Court that none of the Indians of Southeastern Alaska, including the residents of Metlakatla, are within the definition of Indian country as set out in the United States Criminal Code, and that this Court should accept jurisdiction of this matter.