## METLAKATLA INDIAN COMMUNITY, ANNETTE ISLANDS RESERVE, *v.* EGAN, GOVERNOR OF ALASKA, ET AL.

No. 2.   Argued December 13–14, 1961.—Decided March 5, 1962.

*Richard Schifter* argued the cause for appellant. With him on the briefs was *Theodore H. Little.*

*Ralph E. Moody,* Attorney General of Alaska, and, by special leave of Court *pro hac vice, Avrum M. Gross,* Assistant Attorney General, argued the cause and filed briefs for appellees.

*Oscar H. Davis,* by special leave of Court, argued the cause for the United States, as *amicus curiae,* urging reversal. With him on the brief were *Solicitor General Cox* and *Roger P. Marquis.*

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

This is an appeal from a decision of the Supreme Court of the State of Alaska, —— Alaska ——, 362 P. 2d 901, affirming the denial of an injunction against interference by the State with appellant's use of fish traps in the Annette Islands of southeastern Alaska. Appellant rests its claim in part on regulations promulgated by the Secretary of the Interior whereby the Metlakatla Indian Community was accorded the right to erect and to operate salmon traps at four locations in waters surrounding the Annette Islands, which Congress set aside for its use in 1891. Alaska challenged this authorization by a state conservation law forbidding the use of salmon traps.

Long before the white man came to Alaska, the annual migrations of salmon from the sea into Alaska's rivers to spawn served as a food supply for the natives. Commercial salmon fishing has become vital for Alaska's economy, but its exploitation seriously threatened the resource even before the turn of the century. See Gruening, The State of Alaska (1954), pp. 75, 97. Congress in 1889, in 1896, in 1906, and again in 1924 enacted conservation measures, prohibiting any obstruction of waters to impede salmon migration, limiting the times and means of taking salmon,

and authorizing the appropriate department to impose further restrictions.[1] When Alaska was established as a State, Congress withheld jurisdiction over her fisheries until she had made adequate provision for their administration.[2]

Equally with Congress, Alaska has been concerned with the evils of overexploitation. In particular she saw a menace in the fish trap, a labor-saving but costly device, which became in her eyes the symbol of exploitation of her resources by "Stateside" colonialism. See Rogers, Alaska in Transition (1960), pp. 4–15; Gruening, *supra,* at pp. 392–407; Gruening, Let Us End American Colonialism (1955), reprinted at 103 Cong. Rec. 470–474. The fish trap, "a formidable structure," *Alaska Pacific Fisheries* v. *United States,* 248 U. S. 78, 87, consists principally of a fence or netting stretched across or partly across a stream to obstruct the upstream progress of the salmon and turn the fish into the "heart" or "pot" of the trap, where they are imprisoned until removed. See Rogers, *supra,* at p. 7; Gruening, The State of Alaska, *supra,* at pp. 169–170. At one time there were about 700 salmon traps in operation in Alaska. The Secretary of the Interior felt that the fish trap's threat to conservation could be adequately dealt with by regulating the number of fish permitted to escape.[3] Alaska vigorously opposed this. The Territorial Legislature several times sent memorials to Congress urging abo-

---

[1] 25 Stat. 1009; 29 Stat. 316 (Treasury Department); 34 Stat. 478, now 48 U. S. C. §§ 230–239, 241–242 (Commerce Department); 43 Stat. 464, now 48 U. S. C. §§ 221–228 (Commerce Department). The Secretary of the Interior succeeded to these responsibilities in 1939. 1939 Reorganization Plan No. II, § 4 (e), 53 Stat. 1431, 1433.

[2] 72 Stat. 339, 340–341. Alaska adopted a comprehensive fish and game code April 17, 1959, Alaska Laws 1959, c. 94, and received full control over her resources soon afterward.

[3] Letter of Douglas McKay, Secretary of the Interior, to Herbert C. Bonner, Chairman, House Comm. on Merchant Marine & Fisheries, Oct. 7, 1955.

lition of trap fishing.[4] An ordinance to abolish all commercial traps was approved by Alaska voters along with the proposed State Constitution in 1956, and in early 1959 the first State Legislature turned this ordinance into the statute here under review.[5]

The Metlakatla Indians, some 800, led by a British missionary, moved from British Columbia to Alaska in 1887. In 1891 the Annette Islands, south of Ketchikan at the extreme lower end of the Alaskan archipelago, were "set apart as a reservation" by Congress for the Metlakatlans and other Indians, "to be held and used by them in common, under such rules and regulations, and subject to such restrictions, as may be prescribed from time to time by the Secretary of the Interior." 26 Stat. 1095, 1101, 48 U. S. C. § 358. In 1915 the Secretary issued regulations, 25 CFR (1939 ed.), pt. 1, establishing an elective council to make local ordinances for Metlakatla, and also permitting members of the Community to obtain permits for the use of salmon traps in waters adjacent to the Annette Islands. The next year, in furtherance of the Secretary's plan to establish a salmon

---

[4] Alaska Laws 1931, pp. 275–276; 1947, pp. 325–326; 1953, pp. 401–402; 1955, pp. 447–448.

[5] Alaska Laws 1959, c. 17. As amended by *id.*, c. 95, the statute reads as follows:

"Section 1. It shall be unlawful to operate fish traps, including but not limited to floating, pile-driven or hand-driven fish traps, in the State of Alaska on or over any of its lands, tidelands, submerged lands, or waters; provided nothing in this section shall prevent the operation of small hand-driven fish traps of the type ordinarily used on rivers of Alaska which are otherwise legally operated in or above the mouth of any stream or river in Alaska; nor shall this Act be construed so as to violate Sec. 4 of Public Law 85–508, 72 Stat. 339, which constitutes a compact between the United States and Alaska, pursuant to which the State disclaims all right and title to any lands or other property (including fishing rights), the right or title to which may be held by any Indians, Eskimos, or Aleuts (hereinafter called Natives) or is held by the United States in trust for said Natives."

cannery at Metlakatla, President Wilson by proclamation declared the waters within 3,000 feet of certain of these islands to be a part of the Metlakatla Reserve, to be used by the Indians as a source of supply for the intended cannery, "under the general fisheries laws and regulations of the United States as administered by the Secretary of Commerce." 39 Stat. 1777.[6] In 1918, without reference to the proclamation, this Court upheld the right of the Metlakatlans to exclude others from the waters surrounding their islands on the ground that these waters were included within the original reservation by Congress. *Alaska Pacific Fisheries* v. *United States,* 248 U. S. 78.

Ever since 1915, Metlakatla has operated fish traps with the consent of the Secretary of the Interior. Following the enactment of the State's fish-trap law in 1959, the Secretary in the exercise of his transitional power over Alaska fisheries banned all fish traps except those operated by Metlakatla and by other Indians involved in the companion case, *Organized Village of Kake* v. *Egan, post,* p. 60. 24 Fed. Reg. 2053, 2056, 2069 (1959). The following year, having relinquished general control of the fisheries, the Secretary again authorized Metlakatla to operate fish traps at four of eight specified locations, citing as authority the White Act, 43 Stat. 464, as amended, 48 U. S. C. §§ 221–228, and § 4 of the Alaska Statehood Act, 72 Stat. 339, as amended by 73 Stat. 141. 25 CFR (1961 Supp.), pt. 88.[7]

With this background we reach the present controversy. In May, 1959, just before the salmon season began, the

---

[6] In 1934, when the Metlakatlans were made citizens, Congress declared that reservations made for them by statute, order, or proclamation should "continue in full force and effect," 48 Stat. 667.

[7] Since 1944 Metlakatla has been a chartered federal corporation under a constitution adopted pursuant to the Wheeler-Howard Act, 48 Stat. 984, 988, as amended, 49 Stat. 1250, 25 U. S. C. §§ 473a, 476, 477.

State warned Metlakatla and other Indians that she would enforce the fish-trap law against them. The threat was intensified when the State arrested members of other Indian communities and seized one fish trap. Suits were thereupon filed by Metlakatla and by the appellants in the companion case in the interim United States District Court for the District of Alaska, seeking an injunction against interference with their asserted federal rights to fish with traps. All complaints were dismissed, 18 Alaska ——, 174 F. Supp. 500. Appeal was brought to this Court, as the Supreme Court of Alaska had not yet been fully organized. Pending decision, MR. JUSTICE BRENNAN granted a stay of enforcement by the State, 4 L. Ed. 2d 34, 80 S. Ct. 33. The Court assumed jurisdiction and continued the stay but remanded the case to the newly constituted State Supreme Court primarily for its disposition of matters of local law, 363 U. S. 555. That Court affirmed the District Court's dismissal, holding the fish-trap law applicable to Metlakatla and to the other appellants, and upholding its validity as so applied, —— Alaska ——, 362 P. 2d 901. From its judgment, the appeal is properly here under 28 U. S. C. § 1257. We noted probable jurisdiction, 368 U. S. 886.

Several grounds of the decision below are now out of the case on concession of error by Alaska, but she firmly stands on the judgment in her favor. Metlakatla argues that it is immune from the fish-trap law because (1) state law cannot regulate Indian activities on Indian reservations; (2) the State cannot regulate a federal instrumentality; and (3) appellant has been authorized to operate traps by the Secretary of the Interior. The United States has supported Metlakatla as *amicus curiae,* see 362 U. S. 967.

The Indians of southeastern Alaska, who have very substantially adopted and been adopted by the white man's civilization, were never in the hostile and isolated

position of many tribes in other States.   As early as 1886 a federal judge, holding Alaskan Indians subject to the Thirteenth Amendment, denied that the principle of Indian national sovereignty enunciated in *Worcester* v. *Georgia,* 6 Pet. 515, applied to them.   *In re Sah Quah,* 31 F. 327 (D. Alaska).   There were no Indian wars in Alaska, although on at least one occasion, see Gruening, The State of Alaska (1954), pp. 36–37, there were fears of an uprising.   There was never an attempt in Alaska to isolate Indians on reservations.   Very few were ever created, and the purpose of these, in contrast to many in other States, was not to confine the Indians for the protection of the white settlers but to safeguard the Indians against exploitation.   Alaskan Indians are now voting citizens, some of whom occupy prominent public office in the state government.   See *United States* v. *Booth,* 17 Alaska 561, 161 F. Supp. 269 (D. Alaska 1958); *United States* v. *Libby, McNeil & Libby,* 14 Alaska 37, 41–42, 107 F. Supp. 697, 699 (D. Alaska 1952).   Metlakatlans, the State tells us, have always paid state taxes, in contrast to the practice described and prescribed for other reservations in *The Kansas Indians,* 5 Wall. 737, and it has always been assumed that the reservation is subject to state laws.   *United States* v. *Booth,* 17 Alaska, at 563, 161 F. Supp., at 270.   Congress in 1936, 49 Stat. 1250, 48 U. S. C. § 358a, by authorizing the Secretary of the Interior to create Indian reservations of land reserved for Indian uses under 48 U. S. C. § 358, seems to have believed that Metlakatla was no ordinary reservation, since Metlakatla alone is covered in § 358.   Finally, in *United States* v. *Booth, supra,* the District Court for Alaska held that a crime committed on the Metlakatla Reserve, before the extension of jurisdiction over Indian country to Alaska, see p. 56, *infra,* was punishable under territorial laws, since for the reasons here outlined the

Reserve was not "Indian country" within the meaning of 18 U. S. C. §§ 1151–1153.

The words "set apart as a reservation," appearing in the statute creating the Annette Islands Reserve, are substantially the same as used in numerous other statutory reservations. *E. g.,* 13 Stat. 63 (Uinta Valley, Utah); 13 Stat. 541, 559 (Colorado River); 18 Stat. 28 (Gros Ventre and others); 19 Stat. 28, 29 (Pawnee). None of these statutes made express provision for self-government or for state government. Some treaties, such as that with the Cherokees in 1828, 7 Stat. 311, expressly excluded state laws. Other treaties, however, while sometimes phrased in terms of a gift or assignment rather than a reservation of land, made no mention of state power. *E. g.,* Treaty with the Shawnee Tribe, 1825, 7 Stat. 284; Treaty with the Potawatomies, 1837, 7 Stat. 532; Treaty with the New York Indians, 1838, 7 Stat. 550, 551; Treaty with the Sacs and Foxes, 1842, 7 Stat. 596. Later treaties "set apart for the absolute and undisturbed use and occupation" of the Indians certain lands. *E. g.,* Treaty with the Arapahoes and Cheyennes, 1867, 15 Stat. 593, 594; Treaty with the Crow Indians, 1868, 15 Stat. 649, 650. The 1868 Treaty with the Navajos was similar. 15 Stat. 667, 668. And the 1855 treaty with the Quinault Indian Tribe, 12 Stat. 971, which the Supreme Court of Washington held barred state regulation of reservation fishing, promised only that lands would be "reserved, for the use and occupation of the tribes." It was implemented by an executive order of November 7, 1873, by which certain lands were "withdrawn from sale and set apart for the use" of the tribe. See *Pioneer Packing Co.* v. *Winslow,* 159 Wash. 655, 657–658, 294 P. 557, 558.

The provision creating the Metlakatla Reserve in 1891 was added to a House bill dealing with timber lands on the floor of the Senate by Nebraska's Senator Manderson.

Reciting the unfortunate experience of the Metlakatlans in British Columbia and their emigration to Alaska, Senator Manderson explained that his amendment was designed to dispel fears of expulsion from their new lands as from their old, or of intrusion by outsiders seeking to exploit the resources of the islands. The purpose, he stated, was "simply to allow this band of Indians to remain there under such rules and regulations as the Secretary of the Interior may impose, and give them some recognized footing at that place." Remarks by Senators Dawes and Dolph were to the same effect. 21 Cong. Rec. 10092–10093 (1890). The amendment was agreed to and adopted by both Houses after a conference, with no further discussion.

This provision subjecting Metlakatla to rules and regulations of the Secretary of the Interior is unusual. Since 1849 the Secretary had been the officer of the United States charged with administration of the Indian laws, but none of the treaties or statutes which have come to our attention contained such a provision. The Cheyenne and Crow treaties, *supra*, provided that Congress might regulate matters on the reservations, but this was no delegation of Congress' powers to the Secretary. It was but a recognition by the Indians of powers the Constitution gave to the national legislature.

The regulations issued by the Secretary for the government of the Annette Islands January 28, 1915, appear to be without parallel. No such rules applying to other reservations are to be found in the Code of Federal Regulations. The Secretary vested powers of local government in an elective council, 25 CFR (1939 ed.), § 1.2, which was given authority to pass ordinances required not to conflict with "the laws of the United States, the laws of the Territory of Alaska, or the rules and regulations in this part," § 1.10, and subject to review by the Secretary, § 1.62. As a condition to the right to vote in local elec-

tions, members of the Reserve—limited to Metlakatlans and other natives, § 1.51—were required to swear obedience to local laws, laws of the United States, and laws of the Territory of Alaska, § 1.52. Thus the Secretary, in the exercise of the authority delegated him by Congress, subjected self-government of Metlakatla not only to federal oversight but to territorial laws as well. However, as discussed above, an additional regulation issued by the Secretary in 1915 authorized the use of fish traps at Metlakatla, and this permission has been continued in regulations issued since statehood.

Alaska urges that the regulations are invalid because neither the White Act nor the Statehood Act conferred authority on the Secretary to permit Metlakatlans to use fish traps. The State's premise is correct, *Organized Village of Kake* v. *Egan, post,* p. 60. However, Congress in 1891 gave the Secretary authority to make rules governing the Metlakatla Reservation, and his authority, like the reservation itself, *Alaska Pacific Fisheries* v. *United States,* 248 U. S. 78, extended to the waters surrounding the islands. Does this Act validate the regulations in light of subsequent legislative and executive actions?

The Presidential Proclamation of 1916, 39 Stat. 1777, declared waters within 3,000 feet of Annette and adjacent islands to be a part of the Metlakatla Reservation and provided that the Indians should have the use of these waters "under the general fisheries laws and regulations of the United States as administered by the Secretary of Commerce." Alaska argues that the purpose of this provision was to place Metlakatla fishermen in the same position as all others in Alaska by subjecting them to the same laws. In 1916 the general laws were federal; now they are those of the State. Therefore, the State contends, the policy of the Proclamation requires that the provision be construed as subjecting the Metlakatlans to the laws governing all other fishermen, which now include the state

fish-trap law. The Metlakatlans have the right to exclude others from their waters, Alaska agrees, but not the right to be free from regulation.

Alaska does not argue that the Proclamation deprived the Secretary of the Interior of the authority Congress gave him to prescribe rules governing fishing and other activities on the Annette Islands. Assuming the President had power to do so, he did not purport to exercise it. Quite the contrary. The Proclamation recites that the Secretary has determined to establish a cannery for the Metlakatlans, that the Secretary has been given authority to make regulations for Metlakatla by the statute of 1891, and that protection of the Indians' fishing rights is required to assure a supply of fish for the cannery. Apparently the Proclamation was prompted by the threatened encroachment of non-Indian fishermen into Metlakatla waters and the fear that the reservation of the islands might not protect the Indians against such intrusions. No statutory authority for the Proclamation was cited. It was declared to be issued under authority of "the laws of the United States." It is clear that President Wilson was attempting to assist and promote the plans of the Secretary of the Interior to develop the reserve under his statutory authority, not to limit or destroy that authority. The subjection of Metlakatla to general fisheries laws and to regulations of the Secretary of Commerce thus did not make those laws and regulations superior to regulations of the Secretary of the Interior. Rather the general laws and Commerce regulations were adopted as a part of the Interior regulations, so far as not in conflict with other rules adopted by the Secretary of the Interior and subject to his further modification under the power given him in 1891.

Nor did the White Act impair the Secretary's power. That statute permitted the Secretary for conservation purposes to limit the taking of salmon in areas of his des-

ignation, but prohibited his granting exclusive rights in so doing. This Court in *Hynes* v. *Grimes Packing Co.,* 337 U. S. 86, held that the prohibition bars the Secretary from creating exclusive White Act rights in Indians as well as in non-Indians, but it expressly disclaimed holding that no exclusive Indian rights may exist. 337 U. S., at 118–119, 122–123. The Secretary's regulations did not create exclusivity; that was a part of the reservation as created in 1891 and clarified by the proclamation of 1916, which excluded others from fishing in Metlakatla waters.

In 1958, 72 Stat. 545, Alaska was added to the list of States and Territories permitted to exercise civil and criminal jurisdiction over Indian reservations. The State has not argued that this took away the power of the Secretary of the Interior to make regulations contrary to state law. Appellant has argued, to the contrary, that the statute expressly preserved Indian fishing rights from state laws. The statute granting States civil and criminal jurisdiction was passed in 1953, 67 Stat. 588, 18 U. S. C. § 1162, 28 U. S. C. § 1360. Subsection (b) of 18 U. S. C. § 1162 provides that nothing therein shall authorize alienation, encumbrance, or taxation of Indian property, "or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall deprive any Indian or any Indian tribe, band, or community of any right, privilege, or immunity afforded under Federal treaty, agreement, or statute with respect to hunting, trapping, or fishing or the control, licensing, or regulation thereof."

This statute expressly protects against state invasion all uses of Indian property authorized by federal treaty, agreement, statute, or regulation, but only those fishing rights and privileges given by federal treaty, agreement, or statute. It might plausibly be argued, therefore, that

fishing rights given by regulation are not protected and state jurisdiction is established. Legislative history is silent as to the interpretation of the provision. See H. R. Rep. No. 848, 83d Cong., 1st Sess.; S. Rep. No. 699, 83d Cong., 1st Sess.; 99 Cong. Rec. 9962, 10782, 10928 (1953). The apparent purpose of the proviso was to preserve federally granted fishing rights. It would be sheer speculation to attribute significance to the imperfect parallelism of the provisions protecting property and fishing rights in the absence of any suggested reason for excluding fishing rights based on regulations. The process of statutory drafting and evolution, here veiled from scrutiny, is too imprecise to permit such an inference. Cf. *United States* v. *Mersky,* 361 U. S. 431, 437. In any event, the proviso also protects rights given the Indians by statute respecting the control and regulation of fishing, and the 1891 statute gave the Metlakatlans the right to fish under regulations of the Secretary of the Interior.

Section 6 (e) of the Alaska Statehood Act, 72 Stat. 339, 340–341, providing for the conveyance of United States properties "used for the sole purpose of conservation and protection of the fisheries and wildlife of Alaska," contemplated transfer to the State of the same measure of administration and jurisdiction over fisheries and wildlife as possessed by other States, S. Rep. No. 1929, 81st Cong., 2d Sess. 13–14 (1950); H. R. Rep. No. 1731, 80th Cong., 2d Sess. 1 (1948); S. Rep. No. 1028, 83d Cong., 2d Sess. 31 (1954); S. Rep. No. 1163, 85th Cong., 1st Sess. 3 (1957), see *Geer* v. *Connecticut,* 161 U. S. 519, after the transition period during which the State was to establish machinery for this purpose. Section 4, however, as amended by 73 Stat. 141, required Alaska to disclaim all right and title to any United States property not granted her by the statute, and also "to any lands or other property (including fishing rights), the right or title

to which may be held by any Indians, Eskimos, or Aleuts (hereinafter called natives) or is held by the United States in trust for said natives." Such property was to "be and remain under the absolute jurisdiction and control of the United States until disposed of under its authority, except to such extent as the Congress has prescribed or may hereafter prescribe," with immaterial exceptions, and provided that claims against the United States are neither enlarged, diminished, nor recognized by these provisions. This disclaimer is substantially the same as found in the Acts admitting 13 other States. See S. Rep. No. 315, 82d Cong., 1st Sess. 15 (1951).

Alaska does not expressly argue that the Secretary's power was destroyed by the Statehood Act. She does, however, contend that control of all fishing was transferred to the State with no exception for Indian fishing, and that only the exclusiveness of Metlakatla's fishing rights was preserved. But legislative history makes clear that the transfer of jurisdiction over fishing was subject to rights reserved in § 4. S. Rep. No. 1929, 81st Cong., 2d Sess. 2 (1950).

Clearly this section does not protect only "recognized" Indian rights—those the taking of which would be compensable by the United States. Committee reports demonstrate the aim of Congress to preserve the status quo as to a broader class of "right," including, in the case of land, mere possession or occupancy. Compensation was an issue Congress took pains to avoid. See H. R. Rep. No. 1731, 80th Cong., 2d Sess. 15 (1948); H. R. Rep. No. 255, 81st Cong., 1st Sess. 13 (1949); S. Rep. No. 1028, 83d Cong., 2d Sess. 4, 29–30 (1954); S. Rep. No. 1163, 85th Cong., 1st Sess. 15 (1957). We need not here explore the remoter reaches of this protection. The Metlakatla Reservation was Indian property within § 4. Whether or not the "absolute jurisdiction" retained

by the United States in § 4 is exclusive of state authority, see *Organized Village of Kake* v. *Egan, post,* p. 60, the statute clearly preserves federal authority over the reservation. Federal authority was lodged in the Secretary in 1891, and it was not dislodged by the Statehood Act.

However, in issuing the present regulations the Secretary relied not on the 1891 statute but on the White Act and the Statehood Act, neither of which authorized his action. In a letter to the Solicitor General, filed by the United States as an Appendix to its brief as *amicus curiae,* the Secretary left no doubt that in issuing the regulations he acted under compulsion of what he conceived to be his duty under the Statehood Act to preserve the *status quo.* He deemed himself, as it were, to be a mere automaton. The exercise of any authority that the Secretary has under the reservation statute to allow fish traps necessarily involves his judgment on a complex of facts, his evaluation of the relative weights of the Indians' need for traps and of the impact of traps at Metlakatla on the State's interest in conservation. We cannot make this determination for him.

The appropriate course is to vacate the judgment of the Supreme Court of Alaska and remand the case there to be held to give ample opportunity for the Secretary of the Interior with all reasonable expedition to determine, prior to the 1963 salmon fishing season, what, if any, authority he chooses to exercise in light of this opinion. Should the Secretary fail so to act, the parties may apply to the Alaska court for further proceedings not inconsistent with this opinion. See *Addison* v. *Holly Hill Fruit Products, Inc.,* 322 U. S. 607, 618–619. The stay granted by MR. JUSTICE BRENNAN, and continued by the Court, will remain in force until the end of the 1962 salmon fishing season, as defined in the regulations issued by the Secretary of the Interior.

*It is so ordered.*