[833 NE2d 223, 800 NYS2d 80]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v NEIL PATTERSON, JR., Appellant.

Argued April 28, 2005; decided June 14, 2005

### POINTS OF COUNSEL

*Christopher A. Amata,* Albany, *Joseph J. Heath,* Syracuse, and *Kendra E. Winkelstein,* Grand Island, for appellant. I. The court below erred in failing to follow and apply the conservation necessity doctrine. (*Fellows v Blacksmith,* 19 How [60 US] 366; *United States v Forty-Three Gallons of Whiskey,* 93 US 188; *Antoine v Washington,* 420 US 194; *Minnesota v Mille Lacs Band of Chippewa Indians,* 526 US 172; *Oneida County v Oneida Indian Nation of N.Y. State,* 470 US 226; *Rice v Olson,* 324 US 786; *Tulee v Washington,* 315 US 681; *Puyallup Tribe v Department of Game of Wash.,* 391 US 392; *Department of Game of State of Wash. v Puyallup Tribe,* 414 US 44; *United States v State of Wash.,* 384 F Supp 312, 520 F2d 676, 423 US 1086.) II. The People failed at trial to preserve the treaty rights issue for appeal, and the court below therefore improperly decided the issue. (*People v Jones,* 81 AD2d 22; *Sega v State of New York,* 60 NY2d 183; *People v Mucciolo,* 104 AD2d 905; *Shepardson v Town of Schodack,* 83 NY2d 894; *Matter of Richardson v Fiedler Roofing,* 67 NY2d 246.) III. Even if the treaty rights issue was preserved for appeal, the ruling of the court below that the Tuscarora Nation retains no fishing rights in Wilson-Tuscarora State Park under the Treaty of Canandaigua ignores the plain language of the treaty, violates fundamental canons of treaty construction, and fails to follow binding Supreme Court precedent. (*Cherokee Nation v Georgia,* 5 Pet [30 US] 1; *Worcester v Georgia,* 6 Pet [31 US] 515; *Seneca Nation of Indians v New York,* 206 F Supp 2d 448, 382 F3d 245; *People ex rel. Ray v Martin,* 294 NY 61; *Oneida Indian Nation of N.Y. v State of New York,* 860 F2d 1145, 493 US 871; *FPC v Tuscarora Indian Nation,* 362 US 99; *People v Redeye,* 78 Misc 2d 834; *Minnesota v Mille Lacs Band of Chippewa Indians,* 526 US 172; *Menominee Tribe of Indians v United States,* 391 US 404; *Oneida Indian Nation of N.Y. v City of Sherrill, N.Y.,* 337 F3d 139.) IV. The court below erred in finding that enforcement of the subject regulation against defendant did not violate the Department of Environmental Conservation's policy concerning enforcement of hunting and fishing regulations against Indians. (*People ex rel. Kennedy v Becker,* 241 US 556; *United States v State of Wash.,* 384 F Supp 312.)

*Eliot Spitzer, Attorney General,* Albany (*Andrew D. Bing, Caitlin J. Halligan, Robin A. Forshaw* and *Peter H. Schiff* of

counsel), and *Matthew J. Murphy III, District Attorney,* Lockport (*Thomas H. Brandt* of counsel), for respondent. I. The Supreme Court's decision in *FPC v Tuscarora Indian Nation* (362 US 99 [1960]) establishes that defendant had no federal treaty right exempting him from compliance with New York's tip-up regulation while fishing outside the Tuscarora reservation. (*Mescalero Apache Tribe v Jones,* 411 US 145; *Oklahoma Tax Commn. v Chickasaw Nation,* 515 US 450; *Oklahoma Tax Commn. v Citizen Band Potawatomi Indian Tribe of Okla.,* 498 US 505; *Minnesota v Mille Lacs Band of Chippewa Indians,* 526 US 172; *Menominee Tribe of Indians v United States,* 391 US 404; *Oregon Dept. of Fish & Wildlife v Klamath Indian Tribe,* 473 US 753; *People ex rel. Kennedy v Becker,* 241 US 556; *Cooper v Aaron,* 358 US 1; *State Oil Co. v Khan,* 522 US 3; *Rodriguez de Quijas v Shearson/American Express, Inc.,* 490 US 477.) II. Defendant's procedural arguments in support of reversal are meritless. (*People v Jones,* 81 AD2d 22; *People ex rel. Kennedy v Becker,* 241 US 556; *Mescalero Apache Tribe v Jones,* 411 US 145; *Acor Plasticover Co. v Wonderful Plastics Indus. Co.,* 73 AD2d 541, 57 NY2d 669; *FPC v Tuscarora Indian Nation,* 362 US 99.) III. The Department of Environmental Conservation memo did not excuse defendant from compliance with 6 NYCRR 10.4 (a) (7). (*Matter of General Elec. Capital Corp. v New York State Div. of Tax Appeals, Tax Appeals Trib.,* 2 NY3d 249.)

**OPINION OF THE COURT**

ROSENBLATT, J.

On this appeal, we consider whether the Treaty of Canandaigua of 1794 (7 US Stat 44) vests members of the Tuscarora Nation with off-reservation fishing rights on former Seneca lands, the boundaries of which are demarcated by article III of the Treaty. We hold that it does not.

## I.

Defendant, Neil Patterson, is an enrolled member of the Tuscarora Indian Nation, one of the Six Nations of the Iroquois Confederacy. In February 2003, a state environmental conservation officer saw him ice fishing in Wilson-Tuscarora State Park without an identifying tag on his ice fishing tip-up.[1] The park, located in Niagara County, is near the shore of Lake Ontario,

---

1. A tip-up is a device, designed to be left unattended, that supports a fishing line suspended through a hole in the ice. When a fish takes the bait, it triggers a flag or other signal to alert the ice fisher.

outside the Tuscarora reservation, on former Seneca lands. The officer issued defendant a citation for violating 6 NYCRR 10.4 (a) (7), which provides that all "tip-ups must be marked with the name and address of the operator while . . . in the water."

Before the Town of Wilson Justice Court, defendant pleaded not guilty and requested a trial. The conservation officer prosecuted the case and testified that defendant's tip-up had no identification tag. Defendant responded that, under the Treaty of Canandaigua, he had a federally-protected treaty right to fish in Wilson-Tuscarora State Park and that, because section 10.4 (a) (7) does not represent a reasonable and necessary conservation measure, the State lacked the power to enforce the regulation against him. The court found defendant guilty and imposed a $25 fine.

Defendant appealed to County Court, which affirmed. Relying on the United States Supreme Court's opinion in *FPC v Tuscarora Indian Nation* (362 US 99, 121 n 18 [1960]), the court determined that members of the Tuscarora Nation enjoy no treaty right to engage in off-reservation fishing on former Seneca lands. A Judge of this Court granted defendant leave to appeal, and we now affirm.

## II.

It is basic to our system of governance that "all Treaties made . . . shall be the supreme Law of the Land" (US Const art VI [2]).[2] This principle applies with full force to treaties with the Native American nations (*see Settler v Lameer*, 507 F2d 231, 238 n 16 [9th Cir 1974] ["The various Indian treaties constitute the Supreme Law of the Land"]). It is also fundamental that states have sovereign power to regulate hunting and fishing within their borders.[3]

In its "conservation necessity" line of cases, the United States Supreme Court has long experience in mediating between these two vying interests. In *Tulee v Washington* (315 US 681, 683-

---

**2.** *See also Missouri v Holland*, 252 US 416, 434 (1920) ("No doubt the great body of private relations usually fall within the control of the State, but a treaty may override its power").

**3.** *See Lacoste v Department of Conservation of La.*, 263 US 545, 549 (1924) ("The wild animals within its borders are, so far as capable of ownership, owned by the state in its sovereign capacity for the common benefit of all of its people. Because of such ownership, and in the exercise of its police power the state may regulate and control the taking, subsequent use and property rights that may be acquired therein").

684 [1942]), the defendant, a member of the Yakima Nation, was charged with violating a state law requiring a license fee to catch salmon with a net, in spite of treaty language providing that the Yakima retained an "exclusive right of taking fish in all the streams, where running through or bordering said reservation" (*id.* at 683). The treaty also secured the Yakima's right of "taking fish at all usual and accustomed places" (*id.*). The Supreme Court held that the State's attempt to impose a license fee on members of the Yakima was unconstitutional. Critical to the decision was the existence of a treaty fishing right in conflict with the State's regulatory scheme. The Court held that, in the face of this treaty right, the State retained only certain regulatory powers. It could impose on the Yakima, "equally with others such restrictions of a purely regulatory nature concerning the time and manner of fishing outside the reservation as are necessary for the conservation of fish" (*id.* at 684).

Similarly, in *Puyallup Tribe v Department of Game of Wash.* (391 US 392 [1968] [*Puyallup I*]), the tribe had an off-reservation treaty right to take fish "at all usual and accustomed grounds and stations . . . in common with all citizens of the Territory" (*id.* at 395). In light of this treaty, the Supreme Court determined that a state regulation prohibiting fixed net fishing could not be enforced against members of the Puyallup Nation absent a finding that the ban represented a " 'reasonable and necessary' conservation measure" (*id.* at 402 [citation omitted]). It remanded for consideration of this question, as well as for findings on "the issue of equal protection implicit in the phrase 'in common with' " (*id.* at 403; *see also Department of Game of Wash. v Puyallup Tribe*, 414 US 44 [1973] [*Puyallup II*]).

Echoing its opinion in *Tulee*, however, the Court emphasized that, confronted with a treaty off-reservation fishing right, the State may nevertheless regulate "the manner of fishing, the size of the take, . . . and the like . . . in the interest of conservation, provided the regulation meets appropriate standards and does not discriminate against the Indians" (391 US at 398). Most recently, in *Antoine v Washington* (420 US 194 [1975]), the Court held that, in regulating Native American off-reservation treaty fishing rights, the "State must demonstrate that its regulation is a reasonable and necessary conservation measure and that its application to the Indians is necessary in the interest of conservation" (*id.* at 207 [citations omitted]).

Essentially, this line of cases stands for the proposition that a state law or regulation may impair an off-reservation treaty

fishing right only when (1) it represents a reasonable and necessary conservation measure and (2) does not discriminate against the Native American treaty rightholders. The existence of, first, a treaty right and, second, a conflict between the treaty right and a state statute or regulation is the sine qua non of the Supreme Court's conservation necessity jurisprudence. Absent a treaty fishing right, the State enjoys the full run of its police powers in regulating off-reservation fishing.

Today, we hold that the Tuscarora—and, derivatively, defendant—have no right under the Treaty of Canandaigua of 1794 to engage in off-reservation fishing on former Seneca lands.[4] Therefore, we need not consider whether 6 NYCRR 10.4 (a) (7) constitutes a reasonable and necessary conservation measure under *Tulee* and its progeny. The regulation may be applied to members of the Tuscarora fishing off-reservation, just as it applies to everyone else who ice fishes within the state. In reaching this result, we are influenced by the plain language of the Treaty of Canandaigua, along with the history of the land in question and the Supreme Court's opinion in *FPC v Tuscarora Indian Nation* (362 US 99, 121 n 18 [1960]).

Article III of the Treaty first demarcates the lands of the Seneca Nation. It then provides,

> "Now, the United States acknowledge all the land within the aforementioned boundaries, to be property of the Seneka nation; and the United States will never claim the same, nor disturb the Seneka nation, nor any of the Six Nations, or of their Indian friends residing thereon and united with them, in the free use and enjoyment thereof: but it shall remain theirs, until they choose to sell the same to the people of the United States, who have the right to purchase."

Article IV states that,

> "The United States having thus described and acknowledged what lands belong to the Oneidas,

---

4. Defendant argues that his invocation of the "conservation necessity" doctrine represents a challenge to the jurisdiction of New York courts and that the courts below wrongly treated it as a defense of justification pursuant to Penal Law § 35.05 (1) ("conduct which would otherwise constitute an offense is justifiable and not criminal when . . . [s]uch conduct is required or authorized by law"). We need not consider this question. Neither a jurisdictional challenge nor a justification defense can be premised on a nonexistent treaty right.

Onondagas, Cayugas and Senekas, and engaged never to claim the same, nor to disturb them, or any of the Six Nations, or their Indian friends residing thereon and united with them, in the free use and enjoyment thereof: Now, the Six Nations, and each of them, hereby engage that they will never claim any other lands within the boundaries of the United States; nor ever disturb the people of the United States in the free use and enjoyment thereof."

In 1797, three years after signing the Treaty of Canandaigua, the Seneca surrendered their ownership of the land to the United States by the Treaty of Big Tree (7 US Stat 601). Defendant argues, however, that the "free use and enjoyment" language in articles III and IV grants the Tuscarora, as one of the Six Nations, a separate, usufructuary[5] fishing right on Seneca lands independent of the Seneca's possessory interest in the land. The Treaty of Canandaigua, he maintains, constitutes an official recognition of the Iroquois tradition of communal hunting and fishing rights for all members of the Six Nations throughout the territory of the Confederacy. We are sensitive to the historical customs and values of the Six Nations, but we are not persuaded by defendant's reading of the Treaty. Although, as defendant claims, a treaty may provide for usufructuary fishing rights that survive the conveyance of the original possessor's title to the land (*see generally Minnesota v Mille Lacs Band of Chippewa Indians*, 526 US 172 [1999]), the Treaty of Canandaigua does not create such a right.

We are mindful of the bedrock principle of Native American treaty interpretation that any possible ambiguities be resolved in favor of the Native American signatories (*see Worcester v Georgia*, 6 Pet [31 US] 515, 582 [1832] [M'Lean, J., concurring]; *Jones v Meehan*, 175 US 1, 11 [1899]). Further, we appreciate that, where the scope of a treaty right is unclear, we must look "beyond the written words to the larger context that frames the [t]reaty, including 'the history of the treaty, the negotiations, and the practical construction adopted by the parties' " (*Mille Lacs*, 526 US at 196). Articles III and IV, however, admit of no ambiguity. They clearly contemplate that the Seneca and the other Six Nations would have a right to free use and enjoyment

---

5. A usufructuary right is a right to "use and enjoy the fruits of another's property for a period without damaging or diminishing it" (Black's Law Dictionary 1580 [8th ed 2004]).

of Seneca land until such time as the Seneca ceded it to "the people of the United States." In short, the Tuscarora Nation's fishing rights on the land in question were wholly contingent on continued ownership of the land by the Seneca. When the Seneca divested themselves of their interest in the land by the Treaty of Big Tree of 1797, the Tuscarora right to free use and enjoyment ended.[6]

The Supreme Court's opinion in *FPC v Tuscarora Indian Nation* (362 US 99 [1960]) confirms this view. As relevant here, that case addressed the question whether the New York State Power Authority could, pursuant to the Federal Power Act (16 USC § 796 *et seq.*), use eminent domain to seize off-reservation land owned by the Tuscarora in fee simple for use in a hydroelectric dam project. Among other things, the Tuscarora argued that their land, which was situated within the same former Seneca tract as Wilson-Tuscarora State Park, was protected from condemnation by the Treaty of Canandaigua.

In footnote 18 of its opinion, the Supreme Court rejected the Tuscarora's claim (*id.* at 121). The Court concluded, as do we, that the Treaty of Canandaigua covers the lands in question. Nevertheless, it determined that by conveying these lands pursuant to the Treaty of Big Tree of 1797, the Seneca "freed them from the effects of the Treaty of Canandaigua of 1794" (*id.*). Tracing the history of Tuscarora migration to the Niagara frontier, the Court explained that the Tuscarora interest in the Seneca lands was contingent on Seneca beneficence. The Tuscarora tenure on Seneca lands was, the Court observed, as "guests or tenants at will or by sufferance" (*id.*).

The Treaty of Canandaigua did not transform the Tuscarora's status on Seneca lands: "[b]y the Treaty of Canandaigua of 1794 . . . it was recognized that the Senecas alone had possessory rights to the western New York area here involved" (*id.*). Moreover, any treaty interest the Tuscarora had in Seneca land was terminated by the Treaty of Big Tree of 1797, which, the Supreme Court determined, swept away any Tuscarora treaty rights to lands in Western New York. "[T]he lands in question," the Court noted, "were entirely freed from the effects of all

---

**6.** The terms of the Treaty of Big Tree of 1797, which followed the Treaty of Canandaigua by three years, suggest that the express reservation of usufructuary fishing rights was not outside the ken of Native American negotiators in the 1790s. In the Treaty of Big Tree, the Seneca retained for themselves the "privilege of fishing and hunting on the said tract of land hereby intended to be conveyed."

then existing treaties with the Indians" (*id.*). Since the Treaty of Big Tree, the former Seneca lands have "never since been subject to any treaty between the United States and the Tuscaroras" (*id.*).

Both the Supreme Court's thorough treatment of the subject and our own study of the pertinent language satisfy us that the Tuscarora enjoy no right under the Treaty of Canandaigua to free use and enjoyment of former Seneca lands. Defendant's other contentions are without merit.

Accordingly, the order of County Court should be affirmed.

Chief Judge KAYE and Judges G.B. SMITH, CIPARICK, GRAFFEO, READ and R.S. SMITH concur.

Order affirmed.