*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| JOHN ALBERT SCUDERO JR., | ) | |
| | ) | Supreme Court No. S-17549 |
| Appellant, | ) | Court of Appeals No. A-12729 |
| | ) | |
| v. | ) | Superior Court No. 1KE-14-00672 CR |
| | ) | |
| STATE OF ALASKA, | ) | O P I N I O N |
| | ) | |
| Appellee. | ) | No. 7544 – July 23, 2021 |
| | ) | |

Certified Question and Jurisdiction Transfer from the Court of Appeals of the State of Alaska, on appeal from the District Court of the State of Alaska, First Judicial District, Ketchikan, Kevin Miller, Judge.

Appearances: Phillip Paul Weidner, Phillip Paul Weidner & Associates, Anchorage, and A. Cristina Weidner Tafs, Law Office of A. Cristina Weidner Tafs, Anchorage, for Appellant. Kathryn Vogel and Laura Emily Wolff, Assistant Attorneys General, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for Appellee. Curtis W. Martin, Law Offices of Curtis W. Martin, Palmer, and Christopher Lundberg, Haglund Kelley, LLP, Portland, Oregon, for Amicus Curiae Metlakatla Indian Community.

Before: Bolger, Chief Justice, Winfree, Maassen, and Carney, Justices. [Borghesan, Justice, not participating.]

MAASSEN, Justice.

# I.    INTRODUCTION

A member of the Metlakatla Indian Community, a federally recognized Indian tribe, was convicted of several commercial fishing violations in State waters and fined $20,000.  He appealed his conviction and sentence to the court of appeals, which asked us to take jurisdiction of the appeal because of the importance of the primary issue involved:  whether the defendant's aboriginal and treaty-based fishing rights exempt him from State commercial fishing regulations.  The defendant also challenges several evidentiary rulings and the fairness of his sentence.

Because we hold that the State has authority to regulate fishing in State waters in the interests of conservation regardless of the defendant's claimed fishing rights, and because we conclude that the trial court did not abuse its discretion in its procedural rulings, we affirm the conviction.  We also affirm the sentence as not clearly mistaken, except for one detail on which the parties agree:  the district court was mistaken to include a probationary term in the sentence.  We remand the case for modification of the judgments to correct that mistake.

# II.    FACTS AND PROCEEDINGS

## A.    Facts

### 1.    Background:  the Metlakatla Indian Community

The Metlakatla Indian Community is a federally recognized tribe located on the only existing Indian reservation in Alaska.[1]  Its Alaskan roots date from 1887, when about 800 citizens of the Tsimshian Nation migrated from British Columbia to the

---

[1]    *See John v. Baker*, 982 P.2d 738, 750 (Alaska 1999) (explaining that "federal recognition 'institutionalizes the tribe's quasi-sovereign status' " and "permanently establishes a government-to-government relationship between the United States and the recognized tribe as a 'domestic dependent nation' ").

Annette Islands in southeastern Alaska.[2]  Four years later Congress created the Annette Islands Reserve,[3] the stated purpose of which was "simply to allow [the Metlakatla Indian Community] to remain [in the Annette Islands] under such rules and regulations as the Secretary of the Interior may impose, and give them some recognized footing at that place."[4]

In 1916 President Wilson proclaimed that the waters within 3,000 feet of the Annette Islands were part of the Reserve, "to be used by the Indians as a source of supply for [an] intended cannery, 'under the general fisheries laws and regulations of the United States as administered by the Secretary of Commerce.' "[5] Federal regulations provide that the fishery is "exclusively reserved for fishing by the members of the Metlakatla Indian Community and such other Alaskan Natives as have joined or may join them in residence on the aforementioned islands."[6]

The United States Supreme Court has addressed fishing rights disputes between the State of Alaska and tribal communities several times.  In *Metlakatla Indian Community, Annette Islands Reserve v. Egan*, the Court held that the Annette Islands Reserve was under the jurisdiction of the Secretary of the Interior, who had the authority

---

[2]    *Atkinson v. Haldane*, 569 P.2d 151, 153 (Alaska 1977).

[3]    *Id.*; *see also Alaska Pac. Fisheries v. United States*, 248 U.S. 78, 86 (1918).

[4]    *Metlakatla Indian Cmty., Annette Islands Reserve v. Egan*, 369 U.S. 45, 53 (1962).

[5]    *Id.* at 48-49 (quoting 39 Stat. 1777); 25 C.F.R. § 241.2 (2021).

[6]    25 C.F.R. § 241.2(b).  The State may not require members of the Metlakatla Indian Community "to obtain a license or permit . . . to fish in the water of the Annettte Islands Reserve."  25 C.F.R. § 241.2(c).

to decide whether State regulations should apply within its borders.[7] And in *Organized Village of Kake v. Egan*, with no reservation lands at issue, the Court held that the State could regulate the fishing activities of federally recognized tribal members in State waters, because the Court had "never held that States lack power to regulate the exercise of aboriginal Indian rights, such as claimed here, or of those based on occupancy."[8]

### 2. Scudero's prior fishing cases

John Scudero is a member of the Metlakatla Indian Community and, as his brief in this appeal describes him, "a particularly strong and vocal supporter of the Metlakatla Community's right to subsistence and commercial fish outside the 3000-foot zone." Scudero has engaged in "protest fishing" on other occasions, fishing in knowing violation of State fishing laws "as a protest and an exercise of his right to Free Speech and historic rights."

Scudero describes his first act of protest fishing as involving "the herring fishery at Cat Island," where he fished without the proper permits. In early 1994 he "staged a protest of the halibut rules and regulations under the bridge and in front of the channel near Juneau," after first alerting the authorities of his intentions. As a result of these incidents Scudero was charged with two violations of the commercial fishing statutes, but the charges were ultimately dismissed. Later that year, according to Scudero, he responded to a call for help from a fellow fisherman who was being questioned by Alaska Fish and Game officers while fishing close to the boundary line of the Annette Islands Reserve. As Scudero describes it, he sped to assist his fellow fisherman, dropping his gill net in the water upon arrival at the scene. He was charged with and convicted of three violations of the commercial fishing laws, including

---

[7]     369 U.S. at 53-56.

[8]     369 U.S. 60, 76 (1962).

commercial fishing in closed waters, commercial fishing without a permit, and trailing a gill net in closed waters.[9] On appeal, the court of appeals recognized that because Scudero "asserted that he acted with intent to protest an unfair or unjust law, not with intent to take fish for commercial disposition, his defense, if accepted by the jury, would have negated an essential element of the two commercial fishing offenses."[10] The court found that "Scudero was plainly entitled to assert his defense before the jury" but that he had been given an adequate opportunity to do so, and the court therefore affirmed his convictions.[11]

In 2000 Scudero was again charged with commercial fishing without a permit. He entered a no-contest plea and was sentenced in 2002. Later in 2002 he was again charged with the same offense and entered a guilty plea; he was sentenced in 2003.

### 3. The current case

The charges in this case arise from Scudero's fishing activities in 2014, when the Coast Guard found him fishing in State waters outside the Annette Island Reserve's exclusive fishing zone. He was charged under State law with fishing without a permit,[12] fishing in closed waters,[13] and unlawful possession of fish.[14]

---

[9] *See Scudero v. State*, 917 P.2d 683, 684 (Alaska App. 1996).

[10] *Id.* at 686.

[11] *Id.* at 686, 688.

[12] AS 16.43.140(a) ("A person may not operate gear in the commercial taking of fishery resources without a valid entry permit or a valid interim-use permit issued by the commission.").

[13] 5 Alaska Administrative Code (AAC) 33.310(c) (2021) ("Salmon may be taken by drift gillnets in the following locations only during fishing periods established by emergency order that start on a Sunday and close by emergency order," and the
(continued...)

### B.    Current Proceedings

#### 1.    Trial

In January 2015 the district court held a one-day jury trial. A Coast Guard officer testified that he boarded Scudero's fishing vessel after he saw it fishing in closed waters outside the Annette Islands Reserve. The officer testified that Scudero admitted he did not have a permit, he had approximately 45 coho salmon on board, and "his intended plan was to take the fish and return to Metlakatla with them and sell them at the plant."

The parties disputed whether evidence of Scudero's prior convictions should be admitted. The court observed that the 1996 conviction was "very old" but concluded that, in combination with the 2002 and 2003 convictions, it was "highly probative on the intent issue." The court therefore admitted evidence of all three prior convictions.

Scudero testified that on September 23, 2014, he was "fishing to provide for [his] family like [he's] done for almost 40, 45 years." He began to describe the history of Native fishing rights, but the State objected on relevancy grounds. The court sustained the objection, allowing Scudero to testify "with respect to whether or not he was going to be selling the fish or what he was going to do with the fish" but not about the historical background of his claimed rights.

---

[13]    (...continued)
section at issue here "opens on the third Sunday of June.").

[14]    5 AAC 39.197 (2019) ("No person may possess, purchase, sell, barter or transport fish within the state or within water subject to the jurisdiction of the state if that person knows or has reason to know that fish were taken or possessed in contravention of 5 AAC 03-5 AAC 39.").

Scudero's testimony went on to define "fishing to provide for [his] family" as "providing so that [his] family has a way of life that has been done by the Tsimshian people . . . from [time immemorial]." He explained that this "way of life" included "subsistence, bartering, commercial fishing and whatever ways . . . we [subsist] off the land in Indian Country." He also testified that he told the Coast Guard he believed he "was not breaking the law" because he was allowed to fish "at usual and custom[ary] places outside the [Annette Islands] Reserve."

On cross-examination Scudero again admitted knowing he was outside the Reserve's boundary and answered "yes" when asked if he was "engaged in commercial fishing." He also agreed that he had been convicted before of violating the same fishing laws. When asked if he thought his aboriginal rights included fishing without a permit in State waters, he cited federal Indian law and explained: "Under the reserved right[s] doctrine, when President Woodrow Wilson proclaimed 3,000 feet around Annette Island, at that time, he would have had to explicitly say that our rights were taken away from us, which they never were."

The jury returned guilty verdicts on all three charges, and the court set a date for sentencing.

### 2. Sentencing

The court held a sentencing hearing in September 2016. The court considered the *Chaney* factors and applied a statutory aggravator because of Scudero's prior convictions under the same statutes.[15] The court determined that jail time would not be a deterrent and that fines were appropriate because of the crimes' economic nature. For commercial fishing without a permit, Scudero received a $20,000 fine, the

---

[15] *See* AS 12.55.005 (enumerating factors courts must consider in sentencing, following *State v. Chaney*, 477 P.2d 441, 444 (Alaska 1970)).

mandatory minimum.[16]  The court also suspended his commercial fishing privileges and licenses for five years and imposed a one-year probationary period.[17]  For each of the other two convictions Scudero received a fine of $5,000 to run concurrently with the $20,000 fine, as well as the same probationary period.

Scudero appealed to the court of appeals.  The court of appeals asked us to take jurisdiction of the appeal under AS 22.05.015(b) on grounds that "the case involves a significant question of law under the Constitution of the United States or under the constitution of the state or involves an issue of substantial public interest that should be determined by the supreme court."[18]  We agreed to take jurisdiction.

## III.    STANDARD OF REVIEW

We review questions of law de novo.[19]  We review the trial court's evidentiary decisions for abuse of discretion, except for those evidentiary decisions that require determinations of law, which we review de novo.[20]  We review criminal

---

[16]    AS 16.43.970(g)(3).

[17]    The probationary periods are found in the written judgments although the court remarked at the sentencing hearing that no probation would be imposed.  We address this inconsistency below.

[18]    *Scudero v. State*, No. A-12729 (Alaska Court of Appeals Order, Aug. 5, 2019) at 2.  The court of appeals considered the jurisdictional issue raised by Scudero to be "a significant question of law" relating to questions of state-wide importance — "the ability of the State to regulate fishing in its waters" and challenges to regulations based on Article VIII of the Alaska Constitution that "implicate[] issues beyond the criminal law and involve[] a vital part of our state's economy."  *Id.*

[19]    *Ebli v. State, Dep't of Corr.*, 451 P.3d 382, 387 (Alaska 2019).

[20]    *Hess v. State*, 20 P.3d 1121, 1123 (Alaska 2001).

sentences under a "clearly mistaken" standard and give deference to the sentencing court.[21]

## IV.  DISCUSSION

Scudero's main argument on appeal is that the State lacked jurisdiction to enforce its commercial fishing laws against him because his aboriginal fishing rights were not subject to State interference. He also challenges several evidentiary and procedural rulings from trial, as well as his sentence.

### A.  Aboriginal Or Reserved Fishing Rights Do Not Preclude Enforcement Of Alaska's Commercial Fishing Laws In This Case.

Scudero argues that members of the Metlakatla Indian Community retain aboriginal fishing rights that predate Alaska statehood, permitting them to fish without interference in State waters.  He argues that the Metlakatla Indians are in "a much stronger position, with broader sovereign, historic, and aboriginal rights" than members of other Alaska tribes because "the sovereign, historic, and aboriginal rights of the Tsimshian Natives of Metlakatla have been recognized by unilateral statute and presidential proclamation, and the Tsimshian Nation and its people have never relinquished, surrendered, or modified" these rights by treaty or statute.  Scudero argues that these rights permit members of the Tsimshian Nation to fish in State waters for subsistence purposes, which traditionally include bartering and other commercial activities.  The Metlakatla Indian Community, as amicus curiae, supports Scudero's claim to unregulated fishing, arguing that its members have a "reserved right to fish, on a non-exclusive basis, in the off-reservation waters surrounding the Reserve."

Scudero raises several important and unresolved questions about the status of aboriginal and reserved fishing rights for citizens of the Metlakatla Indian

---

[21]  *State v. Korkow*, 314 P.3d 560, 562 (Alaska 2013).

Community. But we do not need to reach those issues today; even assuming the existence of broad off-reservation fishing rights, Scudero's appeal may be decided on the basis of well-established principles governing the interrelationship of aboriginal or treaty-based rights and the State's police powers.

### 1. The development of the "conservation necessity" principle

We begin our analysis with the recognition that treaties, along with the United States Constitution and federal statutes, "are the 'supreme Law of the Land.' "[22] But "[e]ven where reserved by federal treaties, off-reservation hunting and fishing rights have been held subject to state regulation."[23] Acceptable state regulation in this area is generally defined by reference to "conservation necessity."[24] In *Tulee v. Washington*, Tulee, a member of the Yakima tribe, appealed his state-court conviction for catching salmon with a net outside the reservation without the license required by state law.[25] Tulee challenged the validity of the licensing statute "on the ground that it was repugnant to a treaty made between the United States and the Yakima Indians," which preserved to the tribe "the right of taking fish at all usual and accustomed places, in common with

---

[22] *McGirt v. Oklahoma*, 140 S. Ct. 2452, 2462 (2020) (quoting U.S. Const. art. VI, cl. 2).

[23] *Organized Village of Kake v. Egan*, 369 U.S. 60, 75 (1962).

[24] *See, e.g.*, *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 205 (1999) ("This 'conservation necessity' standard accommodates both the State's interest in management of its natural resources and the [Indians'] federally guaranteed treaty rights."); *People v. Patterson*, 833 N.E.2d 223, 224 (N.Y. 2005) ("In its 'conservation necessity' line of cases, the United States Supreme Court has long experience in mediating between" Indian treaty rights and states' interest in regulating hunting and fishing within their borders.).

[25] 315 U.S. 681, 682 (1942).

citizens of the Territory."[26] He argued that the treaty gave him the right to fish "free from state regulation of any kind," while the state argued that its regulation of fishing did not conflict with the treaty as long as "its license laws do not discriminate against Indians."[27]

The Supreme Court rejected both arguments, concluding that "the state's construction of the treaty is too narrow and the appellant's is too broad."[28] The Court held "that while the treaty leaves the state with the power to impose on Indians equally with others such restrictions of a purely regulatory nature concerning the time and manner of fishing outside the reservation as are necessary for the conservation of fish, it forecloses the state from charging the Indians a fee of the kind in question here."[29] The Court observed that the stated purpose of the licensing statute was both regulatory and revenue-producing, and that the regulatory purpose could be accomplished without charging a fee.[30] Because "the imposition of license fees is not indispensable to the effectiveness of a state conservation program," it could not "be reconciled with a fair construction of the treaty," and the state statute was therefore "invalid as applied" to Tulee.[31]

---

[26] *Id.* at 682-83.

[27] *Id.* at 683-84.

[28] *Id.* at 684.

[29] *Id.* (footnote omitted).

[30] *Id.* at 685.

[31] *Id.* Because Scudero's challenge in this case is to any State regulation at all, he does not separately address whether — assuming that the State may regulate his activities in the interests of conservation necessity — its imposition of licensing or permit fees as part of that regulatory scheme violates his aboriginal or treaty rights, as in *Tulee*.

(continued...)

The Court cited these principles again in two later cases also involving Indian fishing rights in Washington. In *Puyallup Tribe v. Department of Game of Washington* (*Puyallup I*), the Court considered the state's attempt to regulate tribal members' use of set nets in fresh water streams; "[t]he nets used [were] concededly illegal if the laws and regulations of the State of Washington [were] valid."[32] The treaty at issue, like that in *Tulee*, reserved to the tribes "[t]he right of taking fish, at all usual and accustomed grounds and stations, . . . in common with all citizens of the Territory."[33] The Court held that because "the *manner* in which the fishing may be done and its purpose, whether or not commercial, are not mentioned in the Treaty," the state was allowed to regulate "the manner of fishing, the size of the take, the restriction of commercial fishing, and the like . . . in the interest of conservation, provided the regulation meets appropriate standards and does not discriminate against Indians."[34] The case was returned to the trial court for determination of "[w]hether the prohibition of the use of set nets in these fresh waters was a 'reasonable and necessary' . . . conservation measure."[35]

Five years later, in *Department of Game of Washington v. Puyallup Tribe* (*Puyallup II*), the Supreme Court held that the state could not limit steelhead fishing in the Puyallup River to hook and line given the tribes' traditional use of nets for that

---

[31]    (...continued)
We therefore do not address this issue either.

[32]    391 U.S. 392, 396 (1968).

[33]    *Id.* at 395.

[34]    *Id.* at 398 (emphasis in original).

[35]    *Id.* at 401-03.

species.[36] The Court observed that "[t]he ban on all net fishing in the Puyallup River for steelhead grants, in effect, the entire run to the sports fishermen," which discriminated against the Indians; the Court ordered the state to make another attempt to fairly apportion the resource among user groups.[37] Justice Douglas, writing for the Court, provided further substance to the "conservation necessity" rationale for state regulation of resources otherwise subject to treaty rights:

> Rights can be controlled by the need to conserve a species; and the time may come when the life of a steelhead is so precarious in a particular stream that all fishing should be banned until the species regains assurance of survival. The police power of the State is adequate to prevent the steelhead from following the fate of the passenger pigeon; and the Treaty does not give the Indians a federal right to pursue the last living steelhead until it enters their nets.[38]

The Ninth Circuit later expanded on Justice Douglas's observation, concluding, in the context of gray whale hunting, that a legislative goal of "species preservation" was not essential to a finding of "conservation necessity."[39] The court found an acceptable conservation purpose in the federal Marine Mammal Protection Act's goal of making "informed, proactive decisions regarding the effect of marine mammal takes" — in that

---

[36]   414 U.S. 44, 46-47 (1973).

[37]   *Id.* at 46-47, 48-49.

[38]   *Id.* at 49; *cf. Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Wisconsin*, 653 F. Supp. 1420, 1434-35 (W.D. Wis. 1987) (observing that the two *Puyallup* "decisions are somewhat unclear and . . . have been the target of criticism," in part due to "their failure to explain the reason why the state may intrude for the particular purpose of conservation").

[39]   *Anderson v. Evans*, 371 F.3d 475, 499 (9th Cir. 2004).

case, "[w]hether the Tribe's whaling will damage the delicate balance of the gray whales in the marine ecosystem."[40]

The Supreme Court has consistently applied the "conservation necessity" principle. It held in *Antoine v. Washington* that the "appropriate standards" requirement for a valid conservation-based regulation — referred to in *Puyallup II* — "means that the State must demonstrate that its regulation is a reasonable and necessary conservation measure, . . . *and* that its application to the Indians is necessary in the interest of conservation."[41] In the recent case of *Washington State Department of Licensing v. Cougar Den*, a plurality of the Court concluded that a state could not tax "a treaty-protected right . . . to travel on the public highway with goods for sale."[42] It cited *Tulee* and *Puyallup I* as helping to define the limits on its holding: that treaty rights are not absolute but may be constrained by state regulation in certain areas, such as conservation in the context of hunting and fishing rights.[43]

---

[40] *Id.*

[41] 420 U.S. 194, 207 (1975) (citing *Puyallup II*) (emphasis in original).

[42] 139 S. Ct. 1000, 1015 (2019).

[43] *Id.*; *see also id.* at 1025 (Roberts, C.J., dissenting) (recognizing "conservation necessity" principle in context of hunting and fishing rights while arguing that plurality opinion too narrowly defined state's authority to regulate for "health and safety" reasons); *Herrera v. Wyoming*, 139 S. Ct. 1686, 1695 (2019) (observing that "States can impose reasonable and nondiscriminatory regulations on an Indian tribe's treaty-based hunting, fishing, and gathering rights on state land when necessary for conservation"); *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 205 (1999) ("We have repeatedly reaffirmed state authority to impose reasonable and necessary nondiscriminatory regulations on Indian hunting, fishing, and gathering rights in the interest of conservation."); *Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 682 (1979) (citing *Puyallup I* for proposition that

(continued...)

It is thus well settled that the State can regulate commercial fishing in its waters for conservation purposes, even by persons whose fishing rights are aboriginal and reserved by treaty. With this background, we turn to Scudero's case.

### 2. Scudero's convictions fall within the conservation necessity principle.

The crimes of which Scudero was convicted are violations of the Limited Entry Act and of regulations enacted under the Act's authority.[44] The Alaska Legislature passed the Limited Entry Act in 1973 to regulate entry into State fisheries.[45] Alaska Statute 16.43.010(a) describes the legislative purpose:

> It is the purpose of this chapter to promote the conservation and the sustained yield management of Alaska's fishery resource and the economic health and stability of commercial fishing in Alaska by regulating and controlling entry of participants into the commercial fisheries in the public interest and without unjust discrimination.[46]

---

[43]     (...continued)
"[a]lthough nontreaty fishermen might be subjected to any reasonable state fishing regulation serving any legitimate purpose, treaty fishermen are immune from all regulation save that required for conservation"); *United States v. Dann*, 873 F.2d 1189, 1200 (9th Cir. 1989) ("Even Indian treaty rights, when shared with others on the public lands or waters, are subject to reasonable regulation that is shown to be essential to the conservation of the common resources and does not discriminate against the Indians.").

[44]     AS 16.43.140(a) ("operat[ing] gear in the commercial taking of fishery resources without a valid entry permit"); 5 AAC 33.310(c)(1)(B) (2020) (taking salmon by drift gillnet during closed period); 5 AAC 39.197 (possessing or transporting fish "taken or possessed in contravention of" other regulations).

[45]     *See Grunert v. State*, 109 P.3d 924, 932-35 (Alaska 2005) (describing history of Limited Entry Act).

[46]     AS 16.43.010 ("Purpose and findings of fact").

We have repeatedly recognized the Act's intertwined purposes of conserving fisheries resources and maintaining a healthy fishing industry.[47] These purposes easily fall within the ambit of the "conservation necessity" principle. Whatever the status of Scudero's aboriginal and reserved rights, they do not shield him from the non-discriminatory operation of State fishing laws that are necessary for the conservation of the resource.

## B. The District Court Did Not Err When It Prevented Scudero From Testifying About His Aboriginal Fishing Rights.

When precluding Scudero from testifying about the history of the Metlakatla Indian Community and his claimed aboriginal fishing rights, the district court determined that the testimony was irrelevant to the charged offenses. Scudero argues that this ruling violated his due process, free speech, and jury trial rights.

"We review questions of law presented by the [trial] court's evidentiary rulings de novo" and other evidentiary questions for an abuse of discretion.[48] The State's

---

[47] *See Johns v. Commercial Fisheries Entry Comm'n*, 758 P.2d 1256, 1263-64 (Alaska 1988) (explaining CFEC's decision to limit number of boats in certain fishery because of low level of fish as "in accord with the purposes of the Limited Entry Act"); *Simpson v. State, Commercial Fisheries Entry Comm'n*, 101 P.3d 605, 611 (Alaska 2004) (observing that "*Johns* . . . requires CFEC to meet the Act's two legislative purposes of 'enabling fishermen to receive adequate remuneration and conserving the fishery' " (quoting *Johns*, 758 P.2d at 1263)); *Matson v. State, Commercial Fisheries Entry Comm'n*, 785 P.2d 1200, 1203 (Alaska 1990) (affirming CFEC's point system related to income dependence on fishery as consistent with and necessary "to the purpose of the Limited Entry Act to conserve the fishery resource by limiting entry while preventing unjust discrimination among applicants for permits"); *Wickersham v. State, Commercial Fisheries Entry Comm'n*, 680 P.2d 1135, 1142 (Alaska 1984) (stating that application deadline furthered Limited Entry Act's purpose by restricting number of people involved in each fishery, thereby providing economic benefit to fishermen and furthering conservation of resource).

[48] *Hess v. State*, 20 P.3d 1121, 1123 (Alaska 2001).

objections to Scudero's testimony were based on relevance.[49] As explained above, the State has the authority to enforce fishing laws necessary to conservation regardless of Scudero's aboriginal and treaty-based rights. And to the extent Scudero intended to testify about issues of law, the testimony would have been inadmissible, as instructing the jury on the law was the province of the court.[50]

But Scudero argues that his testimony would have been relevant as evidence of his intent to "protest fish." He points to the court of appeals opinion from his 1994 convictions, in which the court found that his intent to fish as a way of demonstrating political protest was an "integral aspect" of his defense.[51] The court of appeals agreed in that case that Scudero should be permitted to testify that "he acted with intent to protest an unfair or unjust law, not with the intent to take fish for commercial disposition," because this testimony, "if accepted by the jury, would have negated an essential element of the two commercial fishing offenses."[52]

Here, as in that earlier case, the intent necessary to convict for commercial fishing violations was "the intent of disposing of [the fish] for profit, or by sale, barter,

---

[49] Relevant evidence has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Murray E. Gildersleeve Logging Co. v. N. Timber Corp.*, 670 P.2d 372, 381 (Alaska 1983) (quoting Alaska R. Evid. 401).

[50] *See Miller v. State*, 778 P.2d 593, 597 (Alaska App. 1989) (explaining that whether warrant was required to obtain blood sample was question of law "plainly beyond the competence of a lay witness"); *see also* Jury Instr. No. 1 given in *State v. Scudero*, No. 1KE-14-672 CR (Alaska Super., Jan. 14, 2014) ("After you have heard all of the evidence, I will instruct you on the law that you must apply in reaching your verdict.").

[51] *Scudero v. State*, 917 P.2d 683, 686 (Alaska App. 1996).

[52] *Id.*

trade, or in commercial channels."[53] Scudero admitted that was his intent. Regardless of whether he was also protest fishing, the intent necessary for his conviction was undisputed. The court did not abuse its discretion by excluding Scudero's testimony about the historical underpinnings of his intent to protest fish.[54]

### C. The District Court Did Not Abuse Its Discretion By Admitting Evidence Of Scudero's Prior Convictions.

Scudero also challenges the district court's decision to admit evidence of his 1996, 2002, and 2003 convictions for commercial fishing in State waters without a permit. "[T]rial judges have discretion to determine when prior bad act evidence, including evidence of prior convictions, is admissible at trial. This is a balancing test which trial judges perform under [Alaska] Evidence Rule 404(b)(1) and Evidence Rule 403."[55] Under Evidence Rule 404(b)(1), "evidence of other crimes, wrongs, or acts is not admissible if the sole purpose for offering the evidence is to prove the character of a person in order to show that the person acted in conformity therewith. It is, however, admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." And Evidence Rule 403 allows relevant evidence to be excluded "if its probative value is

---

[53] AS 16.05.940(5) (defining "commercial fishing").

[54] On the same rationale we reject Scudero's argument that the trial court erred by denying him an evidentiary hearing "so he could present evidence from himself and other members of the Tsimshian Nation and the [Metlakatla Indian Community] regarding [their] traditional, indigenous, aboriginal fishing practices."

[55] *Morrow v. State*, 80 P.3d 262, 267 (Alaska App. 2003).

outweighed by the danger of unfair prejudice." We will reverse the trial court's balancing exercise only for an abuse of discretion.[56]

Scudero argues that the prior convictions should have been excluded because they were more than ten years old, proved nothing other than that "he did it before and he's done it again," and were therefore more prejudicial than probative. The district court acknowledged the convictions' age but did not believe that this significantly reduced their probative value with regard to Scudero's intent to illegally commercial fish. And it concluded that the convictions were not unfairly prejudicial because it was unlikely the jurors would convict Scudero "simply because there [were] . . . other priors," and the court would instruct them not to do so.

We conclude that there was no abuse of discretion in the admission of this evidence. Even if the convictions *could* have been unfairly prejudicial on the issue of Scudero's intent, any abuse of discretion in the court's Evidence Rule 403 balancing was necessarily harmless because of Scudero's own admissions about the intent necessary for conviction: that he was commercial fishing and that he knew he was fishing outside the exclusive zone without a permit. And finally, in explaining "other acts" evidence to the jury at the close of trial, the court instructed that "[t]he prosecution cannot meet its burden simply by showing that the defendant has committed similar acts in the past." "Ordinarily we presume that a jury follows the court's limiting instructions,"[57] and, without a compelling reason to think otherwise, we assume the jury did so here.

---

[56]    *Adkinson v. State*, 611 P.2d 528, 532 (Alaska 1980).

[57]    *Dailey v. State*, 65 P.3d 891, 897 (Alaska App. 2003); *see also Bradley v. State*, 197 P.3d 209, 216 (Alaska App. 2008) (applying presumption that jury followed cautionary instruction when judge mistakenly informed jury that defendant had been charged with felony DUI).

**D.** **Scudero's Sentence Was Not Clearly Mistaken, With The Exception Of The Erroneous Imposition Of Probation.**

As part of his sentence Scudero was required to pay concurrent fines for the three offenses totaling $20,000. He first challenges the sentence by arguing that the court could not impose a fine without first inquiring about his ability to pay. But as the State correctly points out, this specific inquiry is no longer required.[58] The fine enforcement statute, AS 12.55.051, grants a right to a hearing upon request "at any time that the defendant is required to pay all or a portion of the fine"; this adequately protects the defendant's due process right not to be imprisoned solely because of an inability to pay.[59]

Scudero's second argument is that a $20,000 fine is so excessive and so disproportionate to his offenses that it violates both the Alaska and United States Constitutions, and that it "will chill and deter protest fishing." He also argues that the court should have suspended the fine, and that it should not have suspended his fishing privileges because the offenses were economic and the punishment "could have a significant impact" on him.

"Sentencing decisions are reviewed under the clearly mistaken standard, giving deference to the sentencing court. '[T]he clearly mistaken test implies a permissible range of reasonable sentences which a reviewing court, after an independent

---

[58] *Dodge v. Municipality of Anchorage*, 877 P.2d 270, 272 (Alaska App. 1994).

[59] AS 12.55.051(c) provides, in part: "A defendant who has been sentenced to pay a fine or restitution may request a hearing regarding the defendants' ability to pay the fine or restitution at any time that the defendant is required to pay all or a portion of the fine or restitution."

review of the record, will not modify.' "[60]  "Under this standard 'the sentence will be modified only in those instances where the reviewing court is convinced that the sentencing court was clearly mistaken in imposing a particular sentence.' "[61]

Scudero's fine is neither excessive nor disproportionate to the offenses. The court imposed the statutory minimum fine, and "judgments about the appropriate punishment for an offense belong in the first instance to the legislature."[62]  The court of appeals explained in *McNabb v. State* why the legislature may have chosen to impose relatively large fines for violations of commercial fishing statutes:  they "reflect the heavily regulated nature of the industry, the large profits which can occur from illegal fishing, and the value of the resource to the citizens of the state.  The fines imposed may be designed to punish violators and need not reflect the profit the defendant received from a violation."[63]

However, the parties agree on one error in the written judgments:  each of them includes a one-year probationary term, even though the judge stated on the record at Scudero's sentencing hearing that probation would not be required.  "As a general rule, when the terms of a defendant's sentence as stated in the court's written [judgment] differ from the terms of the sentence announced orally by the sentencing judge at the

---

[60]     *State v. Korkow*, 314 P.3d 560, 562 (Alaska 2013) (alteration in original) (citation omitted) (quoting *State v. Hodari*, 996 P.2d 1230, 1232 (Alaska 2000)).

[61]     *State v. Tofelogo*, 444 P.3d 151, 155 (Alaska 2019) (quoting *McClain v. State*, 519 P.2d 811, 813-14 (Alaska 1974)).

[62]     *United States v. Bajakajian*, 524 U.S. 321, 336 (1998).

[63]     860 P.2d 1294, 1298-99 (Alaska App. 1993).

defendant's sentencing hearing, the oral sentence controls."[64]

We remand to the district court for removal of the probationary periods from the judgments. In all other respects, the sentence is not clearly mistaken.

## V. CONCLUSION

We AFFIRM Scudero's convictions and REMAND to the district court for modification of the judgments to remove the probationary periods.

---

[64] *Marunich v. State*, 151 P.3d 510, 514 (Alaska App. 2006).